Roberta **HONEY** and William **Honey, Respondents,**

v.

**BARNES HOSPITAL, Wassau Metal Company, Inc. and McCarthy Brothers Construction Company, Appellants.**

Nos. 49080, 49081 and 49086.

Missouri Court of Appeals, Eastern District, Division Two.

Feb. 18, 1986.

Motion for Rehearing and/or Transfer to Denied April 1, 1986.

Application to Transfer Denied May 13, 1986.

Shepherd, Sandberg & Phoenix, Kenneth W. Bean, Kathleen L. Pine, Jill Rubin Hummel, St. Louis, Mo., for Barnes Hosp.

Paul S. Brown, St. Louis, Mo., for Wassau.

Hullverson, Hullverson & Frank, Inc., James E. Hullverson, Stephen H. Ringkamp, St. Louis, Mo., for the Honeys.

Evans & Dixon, Henry D. Menghini, Mary K. Fitzgerald, St. Louis, Mo., for Wischmeyer.

F. Douglas O'Leary, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Keaney, St. Louis, Mo., for McCarthy Bros. Co.

George F. Kosta, Robert L. Devoto, St. Louis, Mo., for Maune Co.

CRIST, Judge.

Barnes Hospital (hospital), McCarthy Brothers Construction Company (general contractor), and Wassau Metals Company, Inc. (window manufacturer) appeal from a $350,000.00 jury verdict on a wrongful death action brought by the parents of a young man who committed suicide by jumping from the fifteenth floor window of hospital. We affirm.

The pertinent facts are: Hospital contracted with Kenneth E. Wischmeyer and Partners (architect) to provide design specifications for a new hospital building. Based on these specifications, hospital sought bids and eventually entered into a contract with general contractor to construct hospital's new "West Pavillion." General contractor subcontracted with the Maune Company (window subcontractor) to provide the West Pavillion windows. In addition, hospital had a direct purchase order with window subcontractor which incorporated architect's specifications. Window subcontractor purchased the windows from window manufacturer. Window manufacturer was required to build the windows in accordance with architect's specifications.

Much of this lawsuit centers on the interpretation of the window specifications. The pertinent specification provides:

C.1 All Patient Room Windows, including Psychiatric Floors:
LIFE SAFETY CODE:
1.1 Life safety hardware shall provide a clean opening between sash and frame of 3 to 5 inches.
1.2 Locking hardware for all patient rooms except at Psychiatric Floor (14th and 15th) shall allow room occupant to operate sash to the limit position without the use of special tools. Hardware shall be white bronze with an applied finish to match the sash.
1.3 Locking hardware for all Psychiatric Floor patient room sash shall be two key operated locks (one per jamb).
1.4 Any exposed fastening shall be tamper proof.
1.5 Sash openings shall be controlled to a "fail-safe" position.
1.6 Release shall be by special captive type stainless fasteners requiring special tool supplied by manufacturer to reverse window to maintenance position.

Parents submitted their case to the jury as follows:

A) Hospital negligently failed to 1) adequately observe decedent; 2) timely administer Haldol (a tranquilizer); 3) have

a securely locked window in its psychiatric patient room; or 4) have limit stops (a device which limits the distance a window may be opened) on the window in its psychiatric room;

B) Window subcontractor and window manufacturer negligently supplied windows without adequate tolerance to allow locking, or negligently supplied windows without limit stops;

C) General contractor negligently failed to warn hospital personnel the windows in the psychiatric ward were not secure when in an apparently closed position, or negligently failed to supervise installation of the windows with limit stops;

D) Architect negligently failed to supervise installation of psychiatric windows with limit stops.

Defendants answered parents' petition, and filed cross-claims seeking apportionment of fault. In addition, hospital cross-claimed for contractual indemnity from general contractor, window subcontractor, and architect.

The jury returned verdicts in favor of parents against hospital, general contractor, and window manufacturer in the amount of $350,000.00. The jury apportioned fault 50% to hospital, 25% to general contractor, and 25% to window manufacturer. On hospital's cross-claims for contractual indemnity, the jury returned a verdict in favor of hospital against general contractor, but for architect and window subcontractor. The trial court, however, granted general contractor's motion for judgment notwithstanding the verdict on hospital's cross-claim.

Hospital appeals from 1) judgment on the jury verdict in favor of parents; 2) judgment on the jury verdicts in favor of architect and window subcontractor on hospital's cross-claims for contractual indemnity; and 3) the trial court's order granting judgment notwithstanding the verdict to general contractor on hospital's claim for contractual indemnity. General contractor and window manufacturer appeal from judgments on the jury verdicts in favor of parents.

## I. HOSPITAL'S APPEAL OF PARENTS' JURY VERDICT

In its first point relied on, hospital asserts the trial court erred in giving Jury Instruction No. 6, because 1) it imposed an erroneous negligence standard on hospital and 2) it failed to distinguish between parents' ordinary negligence and medical malpractice claims. Instruction No. 6 defined negligence as:

The term "negligent" or "negligence" as used in these instructions with respect to defendant Barnes Hospital means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant Barnes Hospital's profession.

Instruction No. 9, parents' verdict director, provided:

Your verdict must be for plaintiff and against Barnes Hospital if you believe:

First, plaintiffs were the parents of decedent, Craig Honey, and

Second, either:

Defendant Barnes Hospital failed to adequately observe defendant, or

Defendant Barnes Hospital failed to timely administer Haldol, or

Defendant Barnes Hospital failed to have a securely locked window in its psychiatric patient room, or

Defendant Barnes Hospital failed to have limit stops on the window in its psychiatric patient room, and

Third, defendant Barnes Hospital, in any one or more of the above respects submitted in paragraph Second, was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause the death of Craig Honey.

Hospital first maintains Instruction No. 6, defining negligence, imposed a "medical malpractice" standard of care on hospital. Hospital claims this standard is erroneous because most of the negligent conduct alleged in Instruction No. 9 relates to nonmedical care and should therefore be governed by an "ordinary care" standard.

Instruction No. 6 does not impose a higher standard of care than ordinary care on hospital. It imposes a standard which requires ordinary care under the specialized circumstances in which hospital operates. There is no question hospital has or should have specialized knowledge with respect to care of psychiatric patients. Each of the theories of recovery submitted by parents in Instruction No. 9 relate in some way to hospital's specialized knowledge with respect to psychiatric patients. Under Instruction No. 6, hospital was not held to a "higher" standard of care; rather, hospital was held to the standard of care ordinarily exercised by hospitals with specialized knowledge as to the care of psychiatric patients. There is no MAI verdict director which specifically applies to cases involving the negligence of hospitals in failing to observe or medicate psychiatric patients, or failing to lock or have limit stops on windows in ·a psychiatric ward. MAI 11.07 (Definitions—Negligence and Ordinary Care Combined) is not precisely applicable, because hospital clearly has specialized knowledge with respect to the care and treatment of psychiatric patients. MAI 11.06 (Definitions—Negligence—Physicians and Surgeons), however, is also not precisely applicable in this situation, because parents' cause of action is not, strictly speaking, medical malpractice. *See Stallman v. Robinson*, 364 Mo. 275, 260 S.W.2d 743, 745 (1953). Under these circumstances, we believe it was necessary to modify MAI 11.06 to accurately submit parents' case to the jury. *See Yoos v. Jewish Hospital of St. Louis*, 645 S.W.2d 177, 191 (Mo.App. 1982).

In its second point relied on, hospital asserts the trial court erred in giving Instruction No. 9, because 1) it failed to distinguish between medical malpractice and general negligence; 2) the fourth paragraph of the instruction improperly instructed the jury on the issue of causation; and 3) there was insufficient evidence to support medical malpractice submissions absent any expert testimony.

Hospital first maintains it was improper for the trial court to give Instruction No. 9 because it failed to distinguish between medical and general negligence. Our opinion relating to hospital's first point relied on has sufficiently answered hospital's first assertion here.

Hospital next maintains paragraph four of Instruction No. 9 improperly instructed the jury on the issue of causation. Paragraph four provided:

Fourth, such negligence directly caused or directly contributed to cause the death of Craig Honey.

MAI 20.02 is the wrongful death verdict director when multiple negligent acts are submitted, as in the present case. MAI 20.02 provides, with respect to causation:

Verdict Directing—Wrongful Death—Multiple Negligent Acts Submitted.

Your verdict must be for plaintiff if you believe:

\* \* \* \* \* \*

Fourth, *as a direct result* of such negligence, \_ died. (Emphasis added.)

MAI 20.02 does not provide for verdict directors against multiple defendants. MAI 19.01, however, generally provides for a modification of verdict directors when joint tort-feasors are involved. MAI 19.01 provides:

Verdict Directing—Joint
Tort-Feasors—Modification
Required.

When the verdict directing instruction directs a verdict against one of two or more joint tort-feasors, the "direct result" language of Paragraph Third of verdict directing instructions such as 17.-01 and 17.02 might be misleading. In such cases plaintiff, at his option, may substitute *any one* of the following:

\* \* \* \* \* \*

Third, such negligence *directly caused or directly contributed to cause damage to* plaintiff. (Emphasis added.)

We believe the modifications suggested by MAI 19.01 apply to the applicable wrongful death verdict director, MAI 20.02. The only difference between MAI 19.01 and

paragraph four of the verdict director submitted by parents is that "the death of" is substituted for "damage to." This substitution serves only to precisely conform the modified verdict director suggested in MAI 19.01 to the applicable cause of action, wrongful death. We find no error.

Hospital's last assertion in its second point relied on is there was insufficient evidence to submit the second paragraph of parents' verdict directing Instruction No. 9. This paragraph provided:

Second, either:

Defendant Barnes Hospital failed to adequately observe defendant, or

Defendant Barnes Hospital failed to timely administer Haldol, or

Defendant Barnes Hospital failed to have a securely locked window in its psychiatric patient room, or

Defendant Barnes Hospital failed to have limit stops on the window in its psychiatric patient room.

Hospital asserts that because there was no expert testimony on locking windows or providing "limit stops" on windows, the last two submissions in the second paragraph of Instruction No. 9 were not supported by the evidence.

■ Hospital's argument relies on the assumption these two submissions are governed by a medical malpractice standard. The general rule in medical malpractice cases is that medical malpractice must be established by expert testimony. *Yoos v. Jewish Hospital of St. Louis*, 645 S.W.2d 177, 183 (Mo.App.1982). Parents' medical expert testified only about medicating and observing decedent, the first two submissions in Instruction No. 9. As we recognized above, however, this is not an ordinary medical malpractice case. Hospital's own evidence was that its specifications were unambiguous in requiring limit stops on the windows in its psychiatric ward, and that the windows should have been securely locked. With limit stops, the window could only be opened three to five inches. The window was either unlocked or decedent managed to unlock it, although no implement which could have been used to

unlock the window was discovered. If the window were securely locked, or open to a maximum distance of five inches, decedent obviously would not have been able to jump from the window. We do not believe expert testimony is required to support the third and fourth submissions of the second paragraph of Instruction No. 9. *See Stallman v. Robinson*, 364 Mo. 275, 260 S.W.2d 743, 749 (1953).

In its third point relied on, hospital asserts the trial court erred in giving Instruction No. 17, because there was no evidence of "aggravating circumstances." Instruction No. 17 provides, in pertinent part:

\* \* \* \* \* \*

In assessing damage, you may take into consideration any aggravating or mitigating circumstances attendant upon the fatal injury.

\* \* \* \* \* \*

The Notes on Use to MAI 5.01 provide this instruction may be given if supported by the evidence.

■ There can be no doubt there were aggravating circumstances in this case. Deceased was admitted to hospital for treatment to prevent the very suicide which occurred. Hospital introduced extensive evidence it wanted limit stops on the windows in its psychiatric intensive care ward, yet accepted the ward from general contractor without limit stops on the windows. There was also evidence the windows would appear to be locked when in fact they were not. Hospital employees found other windows closed but unlocked. General contractor knew its employees could open the windows without special keys. Two of general contractor's employees testified they inspected the window from which decedent committed suicide hours before his death. A hospital nurse testified these two employees told her the window was safe. There was also testimony another psychiatric patient told these two employees he knew how to open the window. General contractor's employees did not report this to the nurse on duty. This nurse did not see decedent for approximately two

and one-half hours before his death. There was clearly sufficient evidence of reckless or conscious indifference to the safety of the patients in the psychiatric ward of hospital to submit the issue of "aggravating circumstances" to the jury. *See Wiseman v. Missouri Pac. R. Co.*, 575 S.W.2d 742, 752–3 (Mo.App.1978); *Dougherty v. Smith*, 480 S.W.2d 519, 521 (Mo.App.1972).

In its fourth point relied on, hospital asserts there was no substantial evidence of causation between any negligent act and decedent's death, because parents' medical expert failed to testify on causation. The issue is whether hospital's failure to observe, medicate, lock windows or provide limit stops on windows directly caused or directly contributed to cause decedent's death.

■ Parents' expert witness, Dr. Boxer, testified hospital failed to use the requisite degree of care and skill customarily used under the same or similar circumstances by hospitals engaged in the care and treatment of psychiatric patients. Dr. Boxer testified decedent's condition required one-to-one surveillance. Parents were not required to establish causation through expert testimony. *See Stallman v. Robinson*, 364 Mo. 275, 260 S.W.2d 743, 749 (1953). Causation may be established through circumstantial evidence, including favorable inferences drawn from all the evidence. Based on the evidence presented at trial, we find parents have presented sufficient evidence of causation between each of hospital's alleged acts of negligence and decedent's death to justify each submission of the second paragraph of Instruction No. 9.

■ In its sixth point relied on, hospital asserts the trial court erred in overruling its motion in limine and admitting into evidence oral testimony and exhibits to explain the window specification, because the specification is not ambiguous. The question of whether the specification is ambiguous was a question of law for the trial court. *Von Seggern v. 310 West 49th Street, Inc.*, 631 S.W.2d 877, 882 (Mo.App. 1982). The trial court found the specification ambiguous. The heading of the specification is titled "C.1 All Patient Room Windows, including Psychiatric Floors:" This heading would seem to indicate each subparagraph below it applied to all windows, including those in psychiatric patient rooms. Subparagraph 1.2 of the specification, however, pertains only to rooms *not* on psychiatric floors. This subparagraph explicitly provides that "[L]ocking hardware ... shall allow room occupant to operate sash to the limit position without the use of special tools." Subparagraph 1.3 provides "[L]ocking hardware for all Psychiatric Floor patient room sash shall be two key operated locks (one per jamb)." This subparagraph does not mention "limit position." Certainly, one reasonable interpretation of the window specification does not require limit stops on psychiatric windows. In addition, hospital did not object at trial to much of the testimony and exhibits relating to the ambiguity of the specifications. A timely objection is required to preserve a point for appellate review after a denial of a motion in limine. *See Peters v. Henshaw*, 640 S.W.2d 197, 201–02 (Mo. App.1982). Hospital's point VI is denied.

In its eleventh point relied on, hospital asserts the trial court erred in permitting parents' counsel to comment on the absence of a witness, because that witness was equally available to parents. Parents' counsel made the following remarks during closing argument:

[MR. HULLVERSON] ... We don't know what Flores, their employee, said, because he never came in front of you and explained where he was. Do you remember, he was the one, he's Barnes' employee, Mr. Flores. He's the one who was assigned to watch over Craig in this lawsuit. We don't know what he says because they didn't bring him in. But he did not tell the Head Nurse. She was interrupted twice during the evening, but she said, 'If he had told me he was pacing, if he'd have told me he was fooling with the door handle, I'd have given him a Haldol.' That's what he's supposed to have because that calms him

down, that's agitation, but Flores isn't here to tell you the manner in which he was pacing, and you can assume that when he doesn't show up, what he has to say will be unfavorable.

MR. BEAN: I'll object to that argument. His deposition is taken, and if Mr. Hullverson wanted to read it, he could have read it. He is still our employee and Mr. Hullverson could have subpoenaed him here. That is an improper argument and I object to it.

THE COURT: I sustain the objection.

MR. HULLVERSON: If the Court please, he is their employee. He is peculiarly available to them, not me.

THE COURT: All right. Let's proceed.

The trial court sustained hospital's objection to this argument. Hospital failed to object or request a clarification following the trial court's statement "All right. Let's proceed." We do not believe this statement amounted to a reversal of the trial court's prior decision sustaining hospital's objection.

■ In its twelfth point relied on, hospital asserts the trial court erred in failing to grant hospital's motion for a mistrial based on comments by parents' attorney concerning photos of decedent which hospital maintains were improper and inflamed and prejudiced the jury. Outside the presence of the jury, hospital's attorney objected to two photos showing decedent's body on the landing below the window from which decedent fell. Each of the photos were included in two packets of eight photos marked exhibits 12 and 13. These exhibits consisted of sixteen photos previously marked and identified during the testimony of a police officer. Following hospital's objection to the two photos, parents' attorney agreed to withdraw the two photos and further stated to the court:

I'll withdraw them, Your Honor, and I'll tell the jury that when they count them, if they do, there's not eight anymore, there's seven.

When parents' attorney passed the photos to the jury, he stated:

Yes, sir, I'll offer all of these Exhibits into evidence, and I request to pass them to the jury with the observation that two of the photographs—each one of these packets of police photographs were numbered and called to be eight in number. There's been an objection. Two of them show the deceased as he appeared on the window and I am going to remove them.

The record does not show parents' attorney intended to inflame and prejudice the jury. There was testimony describing the location of decedent's body after his fall. Parents' counsel had informed the trial court and counsel for the other parties he would tell the jury there were no longer as many photos. The jury never saw the photos. Under these circumstances. We do not believe the trial court abused its discretion in failing to grant a mistrial. *See Kinser v. Elkadi,* 674 S.W.2d 226, 237 (Mo.App. 1984). The record does not show a calculated effort by parents' attorney to evoke the prejudice of the jury.

■ In its thirteenth and final point relied on, hospital asserts the trial court erred in overruling hospital's motion for new trial or for remittitur because the verdict was so excessive as to show passion and prejudice on the part of the jury. Hospital maintains there was insufficient evidence to support a verdict of $350,000, and the verdict violated the rule of uniformity. We have authority to grant a new trial if a verdict is excessive. We have no authority to remit. *See Firestone v. Crown Center Redevelopment Corp.,* 693 S.W.2d 99, 110 (Mo.banc 1985).

Decedent's father had a life expectancy of approximately twenty eight years, while his mother had a life expectancy of approximately thirty-one years. The jury was instructed to "award plaintiff such sums as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained and are reasonably certain to sustain in the future as a direct result of the fatal injury to [decedent]." The jury is allowed to take into account parents' pecuniary losses suffered by reason of the death, funeral expenses, and the

reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support. § 537.090 RSMo 1979.

 In light of these factors, we believe there was sufficient evidence to support the jury's verdict of $350,000. While decedent obviously had psychological problems, parents' medical expert testified his prognosis was fair to good. He further testified that with appropriate medications, decedent would have been able to lead a relatively normal and productive life. Decedent had contributed financially to his mother in the past. He was never involved in drugs or alcohol. Before joining the Coast Guard, decedent assisted his mother as a "peacemaker." There was evidence of aggravating circumstances. The "rule of uniformity" is but one factor in reviewing the excessiveness of jury verdicts. See *Fowler v. Park Corp.*, 673 S.W.2d 749, 758 n. 15 (Mo. banc 1984). When all the factors are considered, we do not believe the jury verdict of $350,000 was excessive.

## II. HOSPITAL'S APPEAL OF JURY VERDICT IN FAVOR OF ARCHITECT ON HOSPITAL'S CROSS CLAIM FOR CONTRACTUAL INDEMNITY

In its seventh point relied on, hospital asserts the trial court erred in allowing into evidence testimony and exhibits regarding a certificate of substantial completion and hospital's lack of complaints about the disputed window. Hospital maintains this evidence was inadmissible, because it was offered to prove modification of the contract ·or waiver or estoppel from enforcement of the contract, and this was not pled as an affirmative defense. We disagree.

 Clearly, affirmative defenses must be pleaded. Rule 55.01. Matters seeking avoidance of a valid contract are affirmative defenses. *Semo Grain Co. v. Oliver Farms, Inc.*, 530 S.W.2d 256, 258 (Mo.App.1975). The essence of hospital's breach of contract actions against the cross-claim defendants was that they failed to provide windows with limit stops in ac-

cordance with the contract for construction. We have previously held the window specifications in the contract ambiguous. The certificate of substantial completion and related evidence tended only to refute hospital's interpretation of the window specifications, upon which hospital relied. This evidence did not. seek to avoid the contract. We do not believe it was necessary for the cross-claim defendants to plead an affirmative defense in order to introduce this evidence.

In its eighth point relied on, hospital asserts the trial court erred in excluding a memorandum from an architect at hospital to defendant architect, because defendant architect's request for production did not seek this document. When hospital sought to introduce the memorandum into evidence, defendant architect objected on the ground it had not been produced pursuant to a request for production. The memorandum was evidence hospital believed psychiatric windows should have limit stops.

 The trial court has considerable discretion in the exclusion of evidence. *Karashin v. Haggard Hauling & Rigging, Inc.*, 653 S.W.2d 203, 205 (Mo. banc 1983). Defendant architect's request for production provided, in pertinent part:

"4. All documents pertaining to window specifications or design requirements for windows in patient rooms ... including but not limited to patient windows in the 14th and 15th floor psychiatric divisions."

We believe defendant architect's request for production encompassed the disputed memorandum. We find no abuse of discretion in the trial court's exclusion of this evidence.

In its ninth point relied on, hospital asserts the trial court erred in overruling its motion for judgment notwithstanding the verdict or new trial on hospital's cross claim for contractual indemnity against architect, because there was no substantial evidence to support the verdict for architect. Hospital maintains the evidence established a breach of contract by architect

in failing to supply windows with limit stops and key locks.

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to architect, giving it the benefit of all favorable inferences. *Affiliated Foods, Inc. v. Strautman,* 656 S.W.2d 753, 763 (Mo.App.1983). We will affirm the verdict if it is supported by substantial evidence. *Morris v. Israel Bros., Inc.,* 510 S.W.2d 437, 447 (Mo.1974).

We believe there is substantial evidence to support the jury verdict in favor of architect on hospital's cross-claim for contractual indemnity. Pursuant to hospital's verdict directing instruction against architect, hospital was entitled to contractual indemnity from architect if the jury believed 1) architect agreed to prepare building specifications in accordance with hospital's requirements (including specifications for the disputed window) and to supervise construction to insure compliance with those specifications, 2) hospital performed and architect failed to perform, and 3) hospital was thereby damaged.

Architect testified a hospital vice-president told him to place the same window in the new West Pavillion as in the existing East Pavillion. These windows were patient inoperable and did not have limit stops. Architect testified he later concluded non-psychiatric patient room windows would have to be operable, to comply with a fire protection code. Architect testified he decided to put limit stops on the patient-operable windows, in order to comply with the fire code and still limit the distance the window could be opened. Architect testified hospital's vice-president asked for limit stops only on patient-operable windows, and never indicated he wanted limit stops on patient-inoperable windows in the psychiatric intensive care ward. The windows installed had a special locking device, which made them patient-inoperable, but did not have limit stops.

■ Based on the testimony and inferences therefrom favorable to architect, we find substantial evidence architect prepared the window specifications in accordance with hospital's communicated requirements, and supervised construction in accordance with those specifications. The judgment entered on the jury verdict in favor of architect on hospital's cross claim for contractual indemnity is affirmed.

## III. HOSPITAL'S APPEAL OF JURY VERDICT IN FAVOR OF WINDOW SUBCONTRACTOR ON HOSPITAL'S CROSSCLAIM FOR CONTRACTUAL INDEMNITY.

■ In its tenth point relied on, hospital asserts the trial court erred in overruling its motion for judgment notwithstanding the verdict or new trial on hospital's cross-claim for contractual indemnity against window subcontractor, because there was no substantial evidence to support the verdict for window subcontractor. Hospital asserts the evidence established a breach of contract by window subcontractor in failing to supply psychiatric windows with limit stops and key locks.

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to window subcontractor, giving it the benefit of all favorable inferences. *Affiliated Foods, Inc. v. Strautman,* 656 S.W.2d 753, 763 (Mo.App.1983). We will affirm the verdict if it is supported by substantial evidence. *Morris v. Israel Bros., Inc.,* 510 S.W.2d 437, 447 (Mo.1974).

We believe there is substantial evidence to support the jury verdict in favor of window subcontractor on hospital's cross-claim for contractual indemnity. Pursuant to hospital's verdict directing instruction against window subcontractor, hospital was entitled to contractual indemnity from window subcontractor if the jury believed 1) window subcontractor agreed to construct the windows in accordance with the specifications; 2) hospital performed and window subcontractor failed to perform the agreement; and 3) hospital was thereby damaged.

As we discussed previously in this opinion, there was a dispute as to whether the window specifications required limit stops

on psychiatric windows. Architect, who together with window subcontractor drafted the window specifications, testified a hospital vice president told him hospital wanted the same windows in the new West Pavillion as in the existing East Pavillion. These windows were patient inoperable and did not have limit stops. We have previously determined the window specifications were ambiguous. Conflicting evidence was presented as to whether the specifications required limit stops on psychiatric windows. The shop drawings, which were part of the contract documents, showed no limit stops on psychiatric windows. Architect, who pursuant to the "General Conditions of the Contract for Construction" was the initial interpreter of the requirements of the contract, did not believe limit stops were required. There was sufficient evidence from which the jury could have determined the specifications did not require limit stops.

Based on the evidence and inferences therefrom favorable to window subcontractor, we find substantial evidence window subcontractor constructed the psychiatric windows in accordance with the specifications. The judgment entered on the jury verdict in favor of window subcontractor on hospital's crossclaim for contractual indemnity is affirmed.

## IV. HOSPITAL'S APPEAL OF GENERAL CONTRACTOR'S JUDGMENT NOTWITHSTANDING THE VERDICT ON HOSPITAL'S CROSS-CLAIM FOR CONTRACTUAL INDEMNITY

In its fifth point, hospital asserts the trial court erred in granting general contractor's motion for judgment notwithstanding the jury verdict, because the verdict was supported by evidence general contractor failed to construct the disputed window in accordance with the specifications.

Instruction No. 24 provided:

If you find in favor of plaintiffs and against defendant Barnes Hospital under Verdict *A,* then defendant Barnes Hospital is entitled to contractual indemnity from defendant McCarthy Brothers Co. if you believe:

First, Barnes Hospital and McCarthy Brothers Co. entered into an agreement whereby McCarthy Brothers agreed to construct ... the window in dispute in accordance with the building specifications and Barnes Hospital agreed to pay McCarthy Brothers Co. for said work, and

Second, Barnes Hospital performed its agreement, and

Third, McCarthy Brothers Co. failed to perform its agreement, and

Fourth, Barnes Hospital was thereby damaged.

Verdict A was the verdict form for parents' claim against defendants. Verdict B required the jury to apportion fault among the defendants found liable in Verdict A. Verdict C was the verdict form for hospital's cross-claims for contractual indemnity against general contractor, window subcontractor, and architect. On hospital's cross-claim against general contractor, the clerk originally read Verdict C as "... we the undersigned jurors, find in favor of [general contractor]." The jury foreman and another juror then indicated this was incorrect, stating the verdict should have been in favor of hospital. The trial court polled the jurors on Verdict C, and all twelve indicated their verdict was for hospital on its cross-claim against general contractor. After the jury returned their verdict, general contractor submitted to the trial court the affidavits of two jurors, who in effect stated they intended hospital to remain liable for fifty percent of the entire verdict, pursuant to the jury's apportionment of fault in Verdict B. The trial court subsequently granted general contractor's motion for judgment notwithstanding the verdict, finding hospital's verdict on its cross-claim against general contractor unsupported by the evidence.

In reviewing the judgment notwithstanding the verdict in favor of general contractor, we consider only the evidence and reasonable inferences therefrom favorable to

the jury verdict, disregarding general contractor's unfavorable evidence. *Bayne v. Jenkins*, 593 S.W.2d 519, 521 (Mo. banc 1980). Despite this strict standard of review, we agree with the trial court and affirm its order granting general contractor judgment notwithstanding the verdict on hospital's cross-claim for contractual indemnity.

The evidence favorable to the verdict is that hospital wanted limit stops on its psychiatric patient rooms. Hospital representatives testified to this effect. The undisputed evidence, however, is that architect interpreted the window specifications to not require limit stops. Pursuant to the contract between hospital and general contractor, architect was in the first instance the interpreter of the requirements of the contract documents. Unlike parents' claims against defendants, which were based on common law negligence, hospital's cross-claim against general contractor was based on breach of contract. Under these circumstances, we find no evidence general contractor failed to construct the new hospital building, including the disputed window, in accordance with the specifications, as interpreted by architect. We therefore hold the trial court properly granted judgment notwithstanding the verdict to general contractor.

## V. GENERAL CONTRACTOR'S APPEAL OF PARENTS' VERDICT

In its first point relied on, general contractor asserts parents failed to make a submissible case. We disagree.

 In determining whether parents made a submissible case, we view the evidence in the light most favorable to parents, giving them the benefit of all favorable inferences. We disregard general contractor's evidence except to the extent it benefits parents' case. *Abraham v. Johnson*, 579 S.W.2d 734, 735 (Mo.App.1979). Parents' verdict directing instruction against general contractor included two theories of recovery—failure to have limit stops on psychiatric windows and failure to

warn hospital of the inadequate locking mechanism on the windows.

General contractor first asserts parents failed to make a submissible case on their limit stop theory. In its first two subpoints, general contractor maintains it could not be liable for allowing construction without limit stops, because the window specifications were ambiguous and architect interpreted the specifications to not require limit stops. When we view the evidence in the light most favorable to parents, however, we must disagree. Parent's based their claim on common law negligence. Hospital vigorously maintained at trial the specifications were not ambiguous and clearly required limit stops. Architect could not "interpret" an unambiguous specification. In addition, architect did not interpret the specification until after the windows were installed and hospital accepted the floor in question.

In its third subpoint, general contractor maintains it could not be liable because hospital accepted the floor, including the windows in dispute, where the absence of limit stops was obvious. When viewed in the light most favorable to parents, however, there is evidence the presence or absence of a limit stop might not be obvious. There was expert testimony the limit stops would not be readily visible.

 In its fourth subpoint, general contractor asserts parents failed to prove the absence of limit stops was a proximate cause of decedent's death. We disagree. The very purpose of limit stops is to prevent the window from opening more than five inches. The limit stops were referred to as "life safety hardware" and "failsafe." There was expert testimony the limit stops would have prevented the window from opening more than five inches. When the evidence and the inferences therefrom are viewed in the light most favorable to parents, we believe there was sufficient evidence from which the jury could believe the presence of a limit stop would have prevented the death of decedent.

General contractor also asserts parents failed to make a submissible case on their theory of failure to warn. In essence, general contractor maintains it had no legal duty to warn hospital the windows on the psychiatric floor were not secure when apparently locked.

Contractors owe a duty to exercise the care required of their profession to those with whom they are not in privity when injury to those third persons is foreseeable. *Chubb Group of Ins. Companies v. C.F. Murphy and Assoc., Inc.*, 656 S.W.2d 766, 775 (Mo.App.1983). After the owner accepts a structure, the general rule is that a general contractor is not liable to persons with whom he did not contract. *Gruhalla v. George Moeller Const. Co.*, 391 S.W.2d 585, 597 (Mo.App.1965). An exception to this rule is made when a structure is so defectively constructed as to be imminently dangerous to the safety of others; where the defects are so hidden and concealed that a reasonably careful inspection would not have disclosed them; and where the defect is known to the contractor but not to the party who accepts the structure. *Begley v. Adaber Realty and Inv. Co.*, 358 S.W.2d 785, 791 (Mo.1962).

Viewing the evidence in the light most favorable to parents, we believe parents made a submissible case on their theory of failure to warn. Injury to psychiatric patients on the fifteenth floor is foreseeable if windows which are supposed to be locked can be easily opened. Even assuming hospital accepted the fifteenth floor, when the evidence is viewed in the light most favorable to parents, we believe parents met the requirements of the *Begley* exception to the general rule of no liability after acceptance. Clearly, the window was imminently dangerous to the safety of psychiatric patients. The window might appear locked when in fact it was unlocked. General contractor's employees inspected the window on the day of decedent's death and found it secure. That evening, however, decedent managed to open the window and commit suicide. One inference from this testimony is that a reasonably

careful inspection would not disclose the defect. Finally, general contractor knew the windows could be opened without the special keys required by the specifications. Its own employees fashioned a simple tool which would open the window. Before hospital accepted the floor, a hospital employee asked an employee of general contractor to check the windows to make sure they were locked. General contractor's employees told a nurse on the psychiatric floor this particular window was safe on the day of the suicide. Viewing the evidence in the light most favorable to parents, we believe parents made a submissible case on their theory of failure to warn.

In its second point relied on, general contractor asserts parents' verdict directing instruction against it was improper. Instruction No. 15 provides:

Your verdict must be for plaintiffs and against defendant McCarthy Brothers Co. if you believe:

First, plaintiffs were the parents of decedent Craig Honey, and

Second, defendant McCarthy Brothers Co., was the general contractor with respect to the windows for use in the psychiatric ward at Barnes Hospital, and

Third, either:

The windows did not have limit stops, or

The windows were not secure when they were in an apparently closed position, and

Fourth, the windows, in one or more of the respects submitted in Paragraph Third, were therefore unreasonably dangerous when put to their intended use, and

Fifth, defendant McCarthy Brothers knew of the intended use of the windows in the psychiatric ward, and

Sixth, Barnes Hospital did not know and by using ordinary care could not have known of such dangerous condition, and

Seventh, defendant McCarthy Brothers Co., knew or by using ordinary care could have known of such dangerous condition, and

Eighth, either:

Defendant McCarthy Brothers Co., failed to warn Barnes Hospital that the windows in the psychiatric ward were not secure when they were in an apparently closed position, or

Defendant McCarthy Brothers failed to supervise installation of windows in the psychiatric ward with limit stops, and

Ninth, defendant McCarthy Brothers Co., in one or more of the respects submitted in Paragraph Eighth, was thereby negligent, and

Tenth, such negligence directly caused or directly contributed to cause the death of Craig Honey.

In its first and second subpoints, general contractor maintains the submission of the limit stop theory and the failure to warn theory was improper, because parents failed to make a submissible case on either theory. Based on our opinion above with respect to general contractor's first point relied on, these subpoints are denied.

■ Next, general contractor maintains MAI 25.06, upon which parents based their verdict director, is not an appropriate instruction against a general contractor. MAI 25.06 is titled "Verdict Directing—Products Liability—Negligently Furnishing Dangerous Instrumentality or Product." There is, however, no specifically applicable MAI instruction. Parents submitted their case against general contractor upon a common law negligence theory. We find MAI 25.06 a satisfactory instruction to modify under these circumstances.

■ General contractor next maintains parents' verdict director improperly failed to require a finding the contract required limit stops on psychiatric windows. We agree with general contractor that parents' submission on failure to supervise installation of psychiatric windows with limit stops required the jury to initially determine the specifications required limit stops. We also believe, however, the jury would not find general contractor liable on this submission unless they believed the specifica-

tions required limit stops. This was not a breach of contract submission. We do not believe it was essential for parents to expressly submit this issue to the jury in order for them to find general contractor negligently failed to supervise installation of psychiatric windows with limit stops.

In its fifth subpoint, general contractor asserts the submitted finding it had superior knowledge was erroneous and unsupported by the evidence. Paragraphs five, six and seven of parents' verdict director against general contractor required the jury to find general contractor knew of the intended use for the windows, hospital did not know and by using ordinary care could not have known of the dangerous conditions of the windows, and general contractor knew or by using ordinary care could have known of the dangerous condition.

■ Viewing the evidence in the light most favorable to parents, we find sufficient evidence to support this submission. General contractor clearly knew of the intended use of the windows in question. The contract specifications explicitly differentiate between patient operable windows and those to be installed on the fifteenth floor psychiatric intensive care ward. These specifications require special features on the psychiatric windows. Since general contractor was required to build the windows in accordance with the contract specifications, we must assume it knew of the intended use of the windows on the fifteenth floor. With respect to whether hospital did not or could not have known of the dangerous condition of the windows, and whether general contractor knew or should have known of the dangerous condition, our discussion with respect to the submissibility of parents' case against general contractor has adequately discussed these points.

■ In the last two subpoints of its second point relied on, general contractor asserts parents' verdict director gave the jury a "roving commission" and was improperly modified so as to be argumentative and misleading. We disagree. If parents were required to submit details of

every alleged act of negligence on the part of general contractor, the instruction would be neither simple nor concise. *See* Rule 70.02(e). We do not believe the modifications of MAI 25.06 which general contractor challenges are argumentative or misleading.

In its third point relied on, general contractor asserts the trial court erred in allowing the jury to consider aggravating circumstances in assessing damages. General contractor maintains there was no evidence of willful misconduct on its part. We initially note parents submitted this damage instruction against all of the defendants. The jury could decide, based on the evidence, which parties were responsible for aggravating circumstances. In addition, the jury was also instructed to take into consideration *mitigating* circumstances.

 Viewing the evidence in the light most favorable to parents, however, we also believe there was sufficient evidence of "aggravating circumstances" on the part of general contractor to submit this issue to the jury. General contractor knew the windows were to be used in the psychiatric intensive care ward. Its employees opened the windows during construction without the required special keys. Two general contractor representatives inspected the window from which decedent committed suicide on the day of the suicide and told the nurse on duty it was safe. During this inspection, another patient told general contractor's representatives he knew how to open the window and offered to show the representatives how. General contractor's representatives effectively ignored this warning. We believe this evidence and the favorable inferences therefrom clearly demonstrate a reckless or conscious indifference to the safety of the patients in the psychiatric intensive care ward. *See Wiseman v. Missouri Pac. R. Co.*, 575 S.W.2d 742, 752–3 (Mo.App.1978). For a related discussion of aggravating circumstances in this case, see our opinion above relating to hospital's appeal of parents' judgment.

In its final point relied on, general contractor asserts the verdict is excessive, violating the rule requiring uniformity of verdicts. We disagree. This point is adequately discussed in our opinion above with respect to hospital's appeal of parents' judgment.

The judgment in favor of parents against general contractor is affirmed.

## VI. WINDOW MANUFACTURER'S APPEAL OF PARENTS' JURY VERDICT

In its first point relied on, window manufacturer asserts parents failed to make a submissible case. We disagree.

In determining whether parents made a submissible case, we view the evidence in the light most favorable to parents, giving them the benefit of all favorable inferences. We disregard window manufacturer's evidence except to the extent it benefits parents' case. *Abraham v. Johnson*, 579 S.W.2d 734, 735 (Mo.App.1979). Parents' verdict directing instruction against window manufacturer included two theories of recovery—failure to supply windows with adequate tolerance to allow locking and failure to supply windows with limit stops.

In its first subpoint, window manufacturer asserts parents failed to make a submissible case on their limit stop theory, because architect interpreted the window specifications to not require limit stops and approved field drawings showing psychiatric windows without limit stops. Window manufacturer claims it "was told to go ahead and manufacture the window without limit stops."

 We find no evidence window manufacturer was ever told to manufacture psychiatric windows without limit stops. *After* the windows were constructed and installed, and hospital accepted the psychiatric floor from general contractor, architect's representative orally agreed the window specifications did not require limit stops. There is no evidence architect rendered a written interpretation of the window specification, which the "General Conditions of the Contract for Construction"

authorize when a dispute arises. When we view the evidence in the light most favorable to parents, we believe parents made a submissible case on their limit stop theory. Parents' theory of recovery against window manufacturer was based upon common law negligence. Hospital asserted the specifications unambiguously called for limit stops on all windows. Window manufacturer could have requested a written interpretation of the window specification prior to building the window, or could have asked a hospital representative as to its intention. We believe parents presented sufficient evidence to make a submissible case on their limit stop theory.

In its second subpoint, window manufacturer asserts there was insufficient evidence the absence of limit stops was a proximate cause of decedent's death. There was expert testimony limit stops would prevent the window from opening more than three to five inches. When the evidence and inferences therefrom are viewed in the light most favorable to parents, we believe there was sufficient evidence from which the jury could believe the presence of a limit stop would have prevented decedent's death. For an extended discussion of this point, see our opinion with respect to subpoint four of general contractor's first point relied on in its appeal of parents' verdict.

In its third subpoint, window manufacturer asserts parents failed to make a submissible case because there was no evidence from which a jury could infer the tightness of the window prevented it from being locked or was the proximate cause of decedent's ability to jump from it. We disagree. There was testimony it was very difficult to close the window, and the window would appear locked when it was in fact unlocked. We believe there is substantial evidence from which the jury could believe the tightness of the window was the proximate cause of decedent's death. There were at least two inspections made of the window from which decedent jumped on the very day he jumped. The jury was entitled to believe that because the window

was too tight, an otherwise effective inspection of the window would not disclose the fact the window was not locked when it appeared locked. From this evidence, we believe the jury could determine the tightness of the window was a proximate cause of decedent's death.

In its second point relied on, window manufacturer asserts parents' verdict directing instruction against it was improper. Instruction No. 12 provided:

Your verdict must be for plaintiffs and against defendant Wassau Metals Co., Inc., if you believe:

First, plaintiffs were the parents of the decedent, Craig Honey, and

Second, defendant Wassau Metal Co., furnished windows for use in the psychiatric ward at Barnes Hospital, and,

Third, either:

The windows did not have limit stops, or

The windows did not have adequate tolerance to allow locking, and

Fourth, the windows, in one or more of the respects submitted in Paragraph Third, were therefore unreasonably dangerous when put to their intended use, and

Fifth, defendant Wassau Metals, Co., Inc., knew of the intended use of the windows in the psychiatric ward, and

Sixth, Barnes Hospital did not know and by using ordinary care could not have known of such dangerous condition, and

Seventh, defendant Wassau Metals knew or by using ordinary care could have known of such dangerous condition, and,

Eighth, either:

Defendant Wassau Metals failed to supply windows with adequate tolerance to allow locking, or

Defendant Wassau Metals failed to supply windows with limit stops, and

Ninth, defendant Wassau Metals, in one or more of the respects submitted in Paragraph Eighth, was thereby negligent, and

Tenth, such negligence directly caused or directly contributed to cause the death of Craig Honey.

In its first subpoint, window manufacturer claims this instruction was improper because there was insufficient evidence it owed or breached any duty to decedent to manufacture windows with limit stops, where architect interpreted the specification to not require limit stops, and approved field drawings of the windows without limit stops. Based on our opinion with respect to subpoint one of window manufacturer's first point relied on, this point is denied.

In its second subpoint, window manufacturer claims Instruction No. 12 is erroneous because it failed to require the jury to make an initial determination limit stops were required. Our opinion pertaining to general contractor's fourth subpoint of its second point relied on has sufficiently answered this contention.

■ In its third subpoint, window manufacturer claims Instruction No. 12 was erroneous and gave the jury a roving commission because there was insufficient evidence the window was unreasonably dangerous without limit stops, the window did not have adequate tolerance to allow locking, or hospital could not have known the window was unreasonably dangerous, all as required by the instruction. When we view the evidence in the light most favorable to parents, however, we disagree. There was testimony "life safety hardware" meant limit stops, and limit stops would allow the window to open only to a "fail-safe" position. The purpose of the limit stop is to prevent the window from opening more than five inches. There was also expert testimony the window was too tight in its frame, which made it very difficult to close and lock. Finally, there was evidence hospital did not know or by using ordinary care could not have known of the dangerous condition of the psychiatric windows. Hospital asked general contractor to close the windows before accepting the floor. The windows were designed to lock when closed. Because the window fit too

tightly in its frame, however, it might appear locked when in fact it was only closed, and would open if pushed with sufficient force. This point is denied.

■ In its fourth subpoint, window manufacturer claims Instruction No. 12 was erroneous because it was based on an inapplicable MAI instruction. Window manufacturer asserts a simple negligence instruction could have been given. There is, however, no MAI instruction precisely applicable to multiple negligent acts of a manufacturer in supplying a product dangerous for its known intended use. We believe Instruction No. 12, as modified, accurately submitted parents' claim against window manufacturer.

In its third point relied on, window manufacturer asserts the trial court erred in giving Instruction No. 17, because there was insufficient evidence of "aggravating circumstances" on the part of window manufacturer. We disagree.

■ We view the evidence in the light most favorable to parents. Windows manufacturer knew these windows were to be used in psychiatric patient rooms. Window manufacturer also knew the windows would be installed on the fifteenth floor. Safety was an obvious concern with these windows. A simple inspection by window manufacturer would have disclosed these windows fit too tightly in their frames. With this defect, psychiatric room windows which were supposed to lock securely when closed might only appear locked when closed, a dangerous situation on the fifteenth floor. We find sufficient evidence of aggravating circumstances on the part of window manufacturer. For a related discussion on aggravating circumstances, see our opinion with respect to the appeals of hospital and general contractor on this point.

In its fourth point relied on, window manufacturer asserts the verdict is against the weight of the evidence because there is insufficient evidence window manufacturer was required to manufacture psychiatric windows with limit stops, and because

there is insufficient evidence the tightness of the window was a proximate cause of decedent's death. We believe our opinion with respect to window manufacturer's first two points relied on has adequately answered this point.

In its final point, window manufacturer claims the verdict is excessive and violates the rule requiring uniformity of verdicts. We disagree. Hospital and general contractor also raised this point. We believe our opinion with respect to hospital's appeal of this point answers window manufacturer's assertion here.

The judgment is affirmed.

DOWD, P.J., and REINHARD, J., concur.