DOROTHY PATON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Paton
Docket No. 21786-88
United States Tax Court
T.C. Memo 1992-627; 1992 Tax Ct. Memo LEXIS 657; 64 T.C.M. (CCH) 1150; October 26, 1992, Filed *657 Decision will be entered for petitioner. For Petitioner: Thomas V. Bender and Joseph D. Booz. For Respondent: Charles M. Berlau. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined a deficiency of $ 18,891.16 in petitioner's 1983 Federal income tax. The sole issue for decision is whether a payment of $ 50,000 is includable in petitioner's gross income, or whether, as petitioner contends, such amount is not includable in gross income because it constitutes a gift within the meaning of section 102(a) or, alternatively, because it constitutes "damages received * * * on account of personal injuries", within the meaning of section 104(a)(2). All section references are to the Internal Revenue Code of 1954, as amended. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Scotland at the time the petition in this case was filed. Prior to June of 1982, petitioner's husband, Dr. Iain Paton, was employed by Burroughs-Wellcome Co. (referred to hereinafter as the company). Dr. Paton was a doctor of veterinary *658 medicine and was employed by the company as general manager of its animal health division. He had been employed by the company since 1978 or 1979. Before that, he and some members of his staff had worked together at another laboratory for many years. A variety of problems at the company placed Dr. Paton under great stress during the early part of 1982. Company management had initiated certain budget cuts and cost-saving measures which forced Dr. Paton to reduce his staff. As a result, he was compelled to fire or lay off a number of employees, some of whom had worked with him for many years. In addition, due to the staff reductions, it became increasingly difficult to maintain the quality of the vaccines which were produced by Dr. Paton's division. In fact, a defective batch of animal vaccines was distributed to the public. The company blamed Dr. Paton for that and for a number of other problems experienced by the company at the time. In June of 1982, Dr. Paton took his own life. He was survived by petitioner and two children. For the remainder of the year, the company continued paying Dr. Paton's salary to his estate. This amounted to approximately $ 54,000. Sometime *659 after Dr. Paton's death, petitioner became convinced that the company bore responsibility for his death. In her view, Dr. Paton had been a man with a keen sense of honor and pride, and he had been deeply troubled by the problems he faced at work. Accordingly, petitioner consulted with her attorneys in the hope of obtaining some recompense from the company for her loss. Petitioner's attorneys advised her that a tort claim in the nature of a wrongful death action might lie against the company, but they were uncertain about the strength of the claim. They recommended, as a first step, writing to the company to request the payment of additional moneys to Dr. Paton's family. Petitioner accepted their recommendation. One of petitioner's attorneys, George D. Blackwood, Jr., Esquire, wrote to the company on March 29, 1983. His letter was couched in terms of a request for help (similar to "severance pay") to a long-time employee. However, the letter contained the clear suggestion that the family held the company responsible for Dr. Paton's death. The letter stated, "The incontrovertible point is that Dr. Paton was pushed to his ultimate decision by pressures which were devastating *660 to him, pressures which were caused by his job." The letter carried an implicit threat of litigation. Several months later, in a letter dated August 16, 1983, the chairman of the board and president of the company, Mr. William M. Sullivan, responded to petitioner's attorney by offering to make an additional payment to Mrs. Paton of $ 50,000. Mr. Sullivan explained the company's offer as follows: I hope you will appreciate that we are making this payment in the same spirit in which we believe it was requested -- out of concern for Mrs. Paton's well-being -- and not because of any legal obligation to do so. While we do not have the sense that Mrs. Paton would pursue legal action against Burroughs-Wellcome even if no additional payment were made to her, we are inclined to ask for a release from any liability to her so as to avoid any misunderstanding. On August 26, 1983, Mrs. Paton executed the release referred to in Mr. Sullivan's letter in exchange for payment of $ 50,000. The release was general in nature and included the following language: 1. DOROTHY PATON releases and discharges the RELEASEES and releasees' heirs, executors, administrators, successors and assigns from all *661 actions, causes of action, charges, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, grievances, arbitrations, complaints, agreements, promises, variances, trespasses, damages, judgements, extents, executions, claims and demands whatsoever * * * which against the RELEASEES, DOROTHY PATON, her heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE. * * * * 3. DOROTHY PATON hereby agrees that she will not at any time publicize, write about or discuss this General Release and Agreement or the terms thereof with any person whatsoever, except her legal counsel and immediate family. The company reported the payment to respondent on Form 1099-MISC as nonemployee compensation. When petitioner's accountant questioned this treatment, a representative of the company answered the accountant in a letter dated June 18, 1987, which stated, "At the time the payment was made it was the view of our tax people that it must be reported *662 on Form 1099 as nonemployee compensation and this was done." Petitioner did not include the payment in the gross income reported on her 1983 income tax return. Instead, she attached a statement to the return which discloses the payment as follows: Taxpayer has received Form 1099-MISC from Burroughs-Wellcome Co. stating that she was paid $ 50,000 in non-employee compensation for 1983. However, this amount has not been included in her taxable income because it was a gift and therefore not taxable compensation. (See attached copy of letter from Burroughs Wellcome Co.). Also attached to the return, as suggested in the above statement, was a copy of Mr. Sullivan's letter dated August 16, 1983, offering to make the payment to petitioner. OPINION The sole issue in this case is whether the company's payment of $ 50,000 to petitioner is includable in petitioner's gross income for 1983, or whether, as petitioner contends, such amount is excludable from gross income as "property acquired by gift" within the meaning of section 102(a) or, alternatively, as "damages received * * * on account of personal injuries", within the meaning of section 104(a)(2). Petitioner bears the burden of *663 proof with respect to both contentions. Rule 142(a), Tax Court Rules of Practice and Procedure.
1. Whether the Payment is Excludable Under Section 102(a) as a Gift
In order to prevail on her first contention, that the subject payment of $ 50,000 is excludable from gross income as a gift, petitioner must prove that the company intended the payment to constitute a "gift" within the meaning of that term in section 102(a). See Commissioner v. Duberstein, 363 U.S. 278, 285-286 (1960). Petitioner must prove that the company was motivated to make the payment by a "'detached and disinterested generosity,'" id. at 285 (quoting Commissioner v. LoBue, 351 U.S. 243, 246 (1956)), or "'out of affection, respect, admiration, charity or like impulses.'" Id. (quoting Robertson v. United States, 343 U.S. 711, 714 (1952)). We find that petitioner did not prove that the company intended to give her a gift of $ 50,000. The company made the payment following correspondence from petitioner's attorney which states that Dr. Paton's "sense of honor and pride had been *664 destroyed by corporate circumstances" and that his suicide was due to "pressures which were caused by his job." The letter suggests that petitioner considered the company responsible for her husband's death and raises the possibility of a lawsuit. This suggestion was not lost on the company, which asked petitioner to sign "a release from any liability to her so as to avoid any misunderstanding." Furthermore, the company reported the payment to the Internal Revenue Service on a Form 1099-MISC as nonemployee compensation. We find that, in making the subject payment to petitioner, the company was acting in its own business interest, to protect itself from a prospective law suit, rather than out of "detached and disinterested generosity". Therefore, we find that the subject payment does not qualify as a gift under section 102(a). 2. Whether the Payment Constitutes "Damages Received * * * on Account of Personal Injuries or Sickness" Under Section 104(a)(2)
Petitioner's alternative contention is that the entire payment of $ 50,000 qualifies under section 104(a)(2). Under that provision, gross income does not include "the amount of any damages received (whether by suit or agreement *665 and whether as lump-sums or as periodic payments) on account of personal injuries or sickness". In order to prevail on this contention, petitioner must prove that the company made the payment to satisfy a tort (or tort-type) claim. United States v. Burke, 504 U.S.     112 S. Ct. 1867 (1992); Metzger v. Commissioner, 88 T.C. 834, 847 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); sec. 1.104-1(c), Income Tax Regs. In the context of a payment made pursuant to a settlement agreement, as in this case, qualification for the exclusion depends on the nature of the underlying claim rather than the validity of the claim. Metzger v. Commissioner, supra; Threlkeld v. Commissioner, 87 T.C. 1294, 1297 (1986), affd. 848 F.2d 81 (6th Cir. 1988); Seay v. Commissioner, 58 T.C. 32, 37 (1972). The most important fact in determining how section 104(a)(2) is to be applied is "the intent of the payor" in making the payment. Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), *666 affg. T.C. Memo. 1964-33; Metzger v. Commissioner, supra at 847-848; Glynn v. Commissioner, 76 T.C. 116, 120 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982). Since the settlement agreement in this case lacks express language stating that the payment was (or was not) made on account of personal injury, petitioner must prove the company's intent from other facts. See, e.g., Knuckles v. Commissioner, supra; Metzger v. Commissioner, supra at 847-849. Petitioner contends that the company's payment to her constituted satisfaction of a potential tort claim stemming from the suicide of her husband. She testified that the severe stress which was placed on Dr. Paton by the company caused him to take his own life. According to petitioner, this stress was brought about by the budget cuts and cost saving measures imposed by the company on Dr. Paton's division which required a significant reduction of his staff with no apparent adjustment for productivity or product quality. In addition, *667 petitioner testified that the company wrongfully blamed Dr. Paton for the production and distribution of a defective batch of animal vaccine. Petitioner also introduced the testimony of her attorney, Mr. Blackwood, who testified that he considered and discussed with petitioner: the issue of whether there was a possible cause of action that could be brought against her husband's employer on the theory that job-related stress was the cause of his having taken his own life that should be compensated for. Mr. Blackwood stated that the suit would have been on a wrongful death theory but he did not identify where such a suit would have been brought. Respondent argues that petitioner failed to meet her burden of proof that the company made the subject payment to settle a tort or tort-type claim. First, respondent argues that the "General Release and Agreement" which the company required petitioner to sign shows that the company paid $ 50,000 "as compensation for all of the claims which may have been brought by petitioner rather than as compensation for one particular type of claim." In this connection, respondent notes that no allocation of the $ 50,000 payment was made to a tort *668 claim. Second, respondent argues that Mr. Sullivan's letter dated August 16, 1983, and the company's letter dated June 18, 1987, responding to petitioner's accountant, "focus on 'additional financial assistance' and 'concern for [petitioner's] well-being' as reasons for the payment." In this regard, respondent points out that the company reported the subject payment to the Internal Revenue Service as nonemployee compensation. Finally, respondent argues that there is no evidence that petitioner or her lawyers asserted a tort claim during their communications with the company. For the reasons discussed below, we agree with petitioner. Respondent does not deny that petitioner had a colorable tort claim against the company nor does respondent contradict the testimony of petitioner's attorney, Mr. Blackwood, that he considered filing suit against the company on a wrongful death theory, and wrote his letter to the company as a prelude to taking such action. On brief, petitioner argues that, under Missouri law as it has developed since the year in issue, an employee has been permitted recovery against an employer for disability caused by job-related stress. See, e.g., Low v. ACF Industries, 772 S.W.2d 904 (Mo. Ct. App. 1989) *669 (allowing recovery under worker's compensation). Missouri also recognizes the validity of wrongful death claims in the case of suicide. See Honey v. Barnes Hospital, 708 S.W.2d 686 (Mo. Ct. App. 1986). In passing, we note that neither party addressed the issue whether petitioner's suit against the company would be governed by Missouri law or the law of some other State, and, in view of respondent's failure to deny that petitioner had a colorable tort claim against the company, it is unnecessary for us to address that issue. We recognize, as noted by respondent, that petitioner never explicitly threatened to sue the company. However, the threat of a lawsuit was implicit in Mr. Blackwood's letter which states, "The incontrovertible point * * * is that Dr. Paton was pushed to his ultimate decision by pressures which were devastating to him, pressures which were caused by his job." In response, the president of the company offered to make the $ 50,000 payment on condition of petitioner's execution of a general release. His letter of August 16, 1983, clearly registered his appreciation of the implicit threat of a lawsuit, when he stated: While we do *670 not have the sense that Mrs. Paton would pursue legal action against Burroughs-Wellcome even if no additional payment were made to her, we are inclined to ask for a release from any liability to her so as to avoid any misunderstanding. We also recognize, as noted by respondent, that the release does not specifically identify the underlying claim or claims involved, nor does it allocate any portion of the payment to a specific tort claim. Nevertheless, there can be little doubt that the company was concerned solely with petitioner's claim regarding the death of her husband. It is unrefuted that the company made no effort to compensate petitioner beyond the contribution of Dr. Paton's 1982 salary until it was contacted by petitioner's counsel. Furthermore, at that time, Dr. Paton's estate had been fully compensated for all contractual claims. Petitioner herself had never performed services for the company, and there is no evidence of any other claim which she held against the company. Indeed, respondent propounds no other explanation of why the company made the payment. The only reasonable conclusion to be drawn from the facts in this case is that the company intended to pay *671 petitioner $ 50,000 in return for her release of potential tort claims arising from the death of Dr. Paton. We find that the $ 50,000 payment to petitioner constituted "damages received * * * on account of personal injuries or sickness" under section 104(a)(2). Accordingly, petitioner correctly excluded such amount from her 1983 return. Decision will be entered for petitioner.