Thomas M. BEGLEY, Respondent,

v.

ADABER REALTY & INVESTMENT COMPANY, a Corporation, Saul Rubin and Louis Rubin, d/b/a Jacob Rubin & Sons, Contractors, a partnership, Saul Rubin, Individually, and Louis Rubin, Individually, Appellants.

No. 48973.

Supreme Court of Missouri,

Division No. 1.

June 11, 1962.

Motion for Rehearing or for Transfer to Court En Banc Denied July 16, 1962.

Evans & Dixon, William Wallace Evans, Henry D. Menghini, St. Louis, for appellants.

Cox, Cox, Cox & Moffitt, Harvey B. Cox, Jr., William A. Moffitt, Jr., St. Louis, for respondent.

HOUSER, Commissioner.

Action for damages for personal injuries sustained when an 80-foot section of over-

head heating ductwork fell from the ceiling of a supermarket in St. Louis and struck a customer who was shopping in the store. Plaintiff, Thomas M. Begley, sued the owner of the building (Adaber Realty & Investment Company, a corporation) and the general contractors who erected the building (Saul and Louis Rubin, a partnership doing business as Jacob Rubin & Sons) for $100,000. A jury returned a verdict "against both of the defendants" for $20,000. Following the overruling of defendants' motion for a new trial, defendants appealed from the judgment.

Instructions Nos. 1 and 3 outline plaintiff's theory of recovery against the partnership and corporation, respectively. We reproduce them in one column to the extent they are identical; in two columns wherein they differ:

"The Court instructs the jury that it is admitted that Jacob Rubin & Sons, Contractors is and was at all times mentioned in evidence a partnership in the State of Missouri, and that Saul Rubin and Louis Rubin were at all times mentioned in evidence partners doing business under the name of Jacob Rubin & Sons, Contractors. The Court further instructs the jury that it is admitted that Adaber Realty & Investment Company, a corporation, entered into a written lease which provided that Adaber Realty & Investment Company, a corporation, would erect a building for use by National Food Stores, Inc., as a retail food store on premises located at 2747 Goodfellow Avenue, St. Louis, Missouri, and that thereafter Adaber Realty & Investment Company arranged for the construction of the said building at 2747 Goodfellow Avenue, St. Louis, Missouri by Jacob Rubin & Sons, Contractors and that thereafter Jacob Rubin & Sons, Contractors undertook to act as general contractors for the construction and erection of the aforesaid building at 2747 Goodfellow Avenue and that after the erection of said building, the said building was leased to National Food Stores, Inc., for a period of time extending beyond the 15th day of February, 1958.

"The Court instructs the jury that if you find and believe from the evidence that on or about the 15th day of February, 1958, plaintiff, Thomas M. Begley, was lawfully in and upon the aforementioned premises located at 2747 Goodfellow Avenue, St. Louis, Missouri, as a business invitee of the National Food Stores, Inc., and that while plaintiff was engaged in shopping in said premises and while he was in an aisleway located therein, a portion of the heating duct work fell from the ceiling of the said building and struck plaintiff, directly and proximately causing plaintiff to be injured, if you so find, and if you further find that the said portion of the heating duct work which fell and struck plaintiff was improperly and insecurely installed and affixed to the ceiling materials of said building at the time it was installed, if you so find, and if you further find that such improper and insecure installation if any you find, as installed would in the future, in all reasonable probability, cause the said heating duct work to come loose and fall down, if you so find, and if you further find that in the performance of their functions as general contractors for the construction and erection of the aforesaid building Saul Rubin and Louis Rubin, d/b/a Jacob Rubin & Sons, Contractors, a partnership, in the exercise of ordinary care should have discovered the improper and insecure installation, if any you find, of the said heating duct work, and in the exercise of ordinary care should have known that said heating duct work as installed would in the future be apt to come down and would be dangerous to persons lawfully in the said premises, if you so find, and if you further find that thereafter the improper and insecure installation, if any you find, of the said heating duct work could not be discovered by National Food Stores, Inc., by the exercise of ordinary care, if you so find, and if you further find that Saul Rubin and Louis Rubin, d/b/a Jacob Rubin & Sons, Contractors, a partnership, knew or in the exercise of ordinary care should have known that National Food Stores, Inc., in the ex-

ercise of ordinary care could not then discover the improper and insecure installation, if any, of the said heating duct work, if you so find,

---

and if you further find that the said Saul Rubin & Louis Rubin, d/b/a Jacob Rubin & Sons, Contractors, a partnership, thereafter caused, allowed and permitted the completed building to be occupied and used by National Food Stores, Inc., without disclosing the improper and insecure installation, if any, of the said heating duct work, if you so find, and if you further find that Saul Rubin & Louis Rubin, d/b/a Jacob Rubin & Sons, Contractors, a partnership, thereby failed to exercise ordinary care for plaintiff's safety and were negligent, if you so find, and if you further find that plaintiff was directly and proximately injured by such negligence, if any, on the part of said defendants, then your verdict shall be in favor of the plaintiff, Thomas M. Begley and against Saul Rubin and Louis Rubin, d/b/a Jacob Rubin & Sons, Contractors, a partnership."

and if you further find that at all times mentioned in evidence Adaber Realty and Investment Company, a corporation, owned the aforesaid real property and premises erected thereon, if you so find, and if you further find that at all times mentioned in evidence Saul Rubin and Louis Rubin were officers and principal stockholders of Adaber Realty & Investment Company, a corporation, if you so find, and if you further find that such Corporation, through the said officers and principal stockholders, if you so find, knew or in the exercise of ordinary care should have known of the improper and insecure installation, if any you find, of the said heating duct work and should have known that National Food Stores, Inc., in the exercise of ordinary care could not discover the improper and insecure installation, if any, of the said heating duct work, if you so find, and if you further find that the said Adaber Realty & Investment Company, a corporation, thereafter caused, allowed and permitted the completed building to be occupied and used by National Food Stores, Inc., without disclosing the improper and insecure installation, if any, of the said heating duct work, if you so find, and if you further find that Adaber Realty & Investment Company, a corporation, thereby failed to exercise ordinary care for plaintiff's safety and was negligent, if you so find, and if you further find that plaintiff, Thomas M. Begley, was directly and proximately injured by such negligence, if any, on the part of the said Adaber Realty & Investment Company, a corporation, then your verdict shall be in favor of the plaintiff, Thomas M. Begley, and against Adaber Realty & Investment Company, a Corporation."

---

Appellants' main point is that the court erred in not directing a verdict for defendants because of lack of evidence.

■ First, appellants say the evidence fails to show beyond speculation and conjecture that the ductwork was improperly

installed, or that improper installation caused it to fall. There was evidence tending to prove the following: The customary method of hanging ductwork from a ceiling is to nail or screw metal straps or hangers to the sides of the joists, the straps dropping down to catch the duct, which is attached to the straps by metal screws. Normally metal hangers or straps are installed before the sheetrock and ceiling tile (Celotex in this instance) is put up. The hangers or straps would have to be securely fastened to the joists to hold the weight. If the ductwork or hangers were attached to the ceiling tile and sheetrock, and not to the joists, or nailed through the sheetrock and tile into the joists, it would not hold but would come down. Toggle bolts through sheetrock would not hold. It would not be normal procedure to drive nails straight up into the joists. Nails should be driven into the sides of the joists, horizontal to the floor and perpendicular into the sides of the joists, which gives greater support. There should be hangers every four feet. Several witnesses observed no hangers or metal straps coming down through the ceiling, or running up through the ceiling and attached to the joists. Others testified there were "very few," or only two, three or four hangers or straps in the entire 80 feet of ductwork that fell. One witness testified the straps were approximately fifteen feet apart. After the ductwork fell, nail holes in the top of the ductwork were seen. Nails were found on the floor. An examination of some of the hangers that held the ductwork to the ceiling showed there were nails projecting through the top flange, and holes in the Celotex the size of a nail. A spot on the ceiling was visible "where the object had pulled out that was holding the duct," and no structure visible beyond the Celotex itself that a nail may have been driven into. There were no holes, openings, slits or slots leading up through the Celotex indicating that anything had gone up through the plasterboard into the joists, and no hangers were observed running up into the attic, or projecting down through the ceiling. It seemed to the store manager that the ductwork was "just held to the ceiling by nails; * * * just nailed to the ceiling." There were "nails stuck in the top flange of the strap." At the back of the store there was a small, short-threaded bolt which broke loose. It looked like "it just pulled out of" the Celotex ceiling. There was a slight hole, about half an inch, where it had "just jerked loose." The bolt "had just been attached to the top of the Celotex." The ductwork was held in place at the ceiling with a flange that was "nailed into the ceiling." Herbert Thomas, superintendent for the partnership, examined the ceiling after the ductwork fell. He said three or four of the ceiling tiles had dropped out of the ceiling. He did not remember seeing any hangers hanging or coming down through the ceiling. The joists were on 16-inch centers and they ran the length of the store, east and west, the same as the ductwork. Since the ductwork was wider than 16 inches it would be impossible to "hit a joist" with a nail on both sides of the duct. A joist could be "hit" on one side or the other but not on both sides. This was sufficient evidence to submit the question of improper installation and causation.

█ Second, appellants say there is no evidence that Saul and Louis Rubin, as general contractors, knew or could have known of or discovered the improper installation prior to the completion of the work and its acceptance by the occupant; that the ductwork was installed in a two-day period; that once the ductwork had been installed it could not be determined by an exterior examination what fasteners or screws were holding it up; that interior fastenings may have been supporting it, and interior fastenings could not have been seen, but would be hidden from view. There was evidence that Saul Rubin, a licensed architect and builder for 35 years, designed the store building, drew the plans and supervised the construction. He had occasion to be on the job site while the ductwork was being done. He checked the progress of the Southern Heating Company

in the physical conduct of their work. He saw the work done when the ductwork was put up . . . saw the men working on the ducts. He visited the job every day, and had the responsibility of supervision over the subcontractors, and to see that the work was progressing and that they were building it according to the blueprints. Saul Rubin or Mr. Thomas, superintendent for Jacob Rubin & Sons, were responsible to supervise the whole job and to see that the hangers were put up before the ceiling tile was installed. Thomas was on the job every day the building was under construction. If Saul "saw something wrong, somebody wasn't doing something the way [he] thought it ought to be done"; if he saw the Southern Heating Company people "nailing these straps to the ceiling through the Celotex and sheetrock into the joists," he would call their attention to it and tell them to correct it. This was ample evidence to submit the question of knowledge, actual and constructive, on the part of the partnership.

Third, appellants contend there is no evidence that Adaber was in control of the building at the time of the accident; that National had exclusive possession for more than three years prior to the accident; that there was no evidence that Adaber knew or could have known of the alleged improper installation prior to the occupancy of the store by National, or that Adaber concealed the condition from the lessee. But plaintiff did not seek to hold Adaber on the ground that Adaber was in control of the building at the time of the accident. Plaintiff's case against Adaber was based upon improper and insecure installation creating a dangerous condition, knowledge of which was discoverable by Saul and Louis Rubin, as general contractors, and imputable to Adaber, because Saul and Louis were officers and principal stockholders of Adaber; and Adaber's negligence, with constructive knowledge of the dangerous condition, in failing to exercise ordinary care for plaintiff's safety by permitting National to occupy the building without disclosing to National the improper and insecure installation. Appellants argue that constructive knowledge cannot be imputed to Adaber because Saul and Louis were upon the premises on behalf of their partnership and not on behalf of Adaber. The evidence shows that Saul and Louis were the sole members of the partnership and the controlling and principal stockholders and president and secretary-treasurer, respectively, of the corporation. The corporation held record title to the building and no one else had any financial interest in it. The partnership ultimately received the rents from the building, which were deposited in the bank, and Saul and Louis distributed the profits between themselves. While it is true that when Saul was on the premises during the construction period he was acting on behalf of the partnership, it is equally true that he was also on the premises on behalf of the corporation. Appellants will not be heard to say that the corporation had no interest in the proper and secure installation of the ductwork, for it was as much interested in the performance of the work, including the proper installation of the ducts, as the partnership. It was within the range of Saul's official duties as president of the corporation to see to it that the subcontractor properly and securely installed the ductwork in the corporation's building. There was a complete unity and no adversity of interest as between corporation and partnership. There was a total blending of personal, partnership and corporate interest, as a result of which the knowledge imputable to Saul as a member of the partnership was fully imputable to the corporation. "Where a corporation's agent represents, with its consent, both the corporation and a partnership, of which such agent is a member, in a transaction between them, knowledge possessed by him as partner and affecting the transaction will be imputed to the corporation; * * *." 19 C.J.S. Corporations § 1086. There was a basis for a finding that the corporation, with constructive knowledge thereof, permitted its lessee to enter and occupy the premises

without disclosure of this dangerous condition.

■ Both appellants disclaim liability on the ground that the ductwork was actually installed by an independent subcontractor, Southern Heating Company, which was not an employee of either appellant, and for whose independent acts of negligence neither appellant is liable. But plaintiff did not go to the jury on the basis of the defendants' liability for the subcontractor's negligence. Plaintiff's theory was that defendants were negligent because, with constructive knowledge of the improper and insecure installation, they permitted the lessee to open this store to the public without informing the lessee of the dangerous condition. As far as the liability of Adaber is concerned the applicable rule is that "Where * * * at the time of the execution of the lease there are latent defects in the premises which are known to the lessor and not known or discoverable by the tenant in the exercise of due care, and which involve an unreasonable risk of bodily harm to persons upon the premises, the lessor is under a duty to disclose to the tenant the existence of such defects, and, if he conceals the presence of such defects, he will be liable for personal injuries resulting to the * * * invitees of the tenant from such defects." Grimmeissen v. Walgreen Drug Stores, Mo.App., 229 S.W.2d 593, 1. c. 598, cases and authorities cited; 52 C.J.S. Landlord and Tenant § 417, a. (3). Plaintiff's theory is equally applicable to the construction contractors, as an exception to the general rule of nonliability after acceptance of the work for injuries to third persons with whom the contractor is not in a contractual relation. This exception applies where the structure was so defectively constructed as to be essentially and imminently dangerous to the safety of others; the defects are so hidden and concealed that a reasonably careful inspection would not have disclosed them, and these things are known to the defendants but not to those who accepted them. Casey v. Hoover, 114 Mo.App. 47, 89 S.W. 330, 335; Anno., 13 A.L.R.2d, § 33,

p. 233. That the defect was hidden, concealed and not observable by the tenant upon a reasonably careful inspection (National inspected the construction after its completion and before taking possession) is apparent from testimony that the nails, screws and attachments were visible and could have been seen as the ductwork was being installed, but after it was completed and the ductwork affixed to the ceiling "you could not see them"; "We wouldn't know unless we took it apart what was inside to hold it up."

■ With respect to appellant-partners' contention that they should not be held liable for an accident occurring over three years subsequent to the performance of their work contract, while doubtless liability in some cases might be controlled by considerations of ordinary wear and tear, defects incident to lapse of time, etc., " * * * if the construction is such that danger may be anticipated therefrom by reason of its very defects it is imminent or * * * inherent, even though it does not occur immediately or soon after use." Colbert v. Holland Furnace Co., 241 Ill.App. 583, 1. c. 592.

■ Next, appellants attack Instructions Nos. 1 and 3. Appellants say there was no evidence to support them; that the evidence as to original installation was uncertain and conflicting. There was ample evidence of improper and insecure installation, summarized above. Appellants see a conflict in the testimony given by Saul Rubin, claiming that having at first testified the ductwork was put up by straps attached to the joists, dropped down, and the ducts were fastened to the straps by metal screws, he later testified he was not sure how the work was done. Saul's admissions, which were read into the record from a transcript, and his testimony given in person at the trial, considered as a whole, indicate no such conflict. Fairly interpreted, his testimony was that the usual, normal and proper method or procedure was as indicated, but that he did not know exactly how the

work actually was done; that it had been five years, and although he had seen the work done, he didn't "recall exactly what each operation was at any particular time"; that he was not there all the time the work was in progress. Appellants say there was insufficient hypothesization of how and in what manner and particulars the ductwork was "improperly and insecurely installed and affixed to the ceiling * * *": what type of improper installation existed which would thereafter cause it "in all reasonable probability" to "come loose and fall down"; what specific defect there was or the nature of the improper installation which "in the exercise of ordinary care" the partnership could have discovered or of which Adaber "knew or in the exercise of ordinary care should have known," which should have been disclosed to National but which "could not be discovered by [National] by the exercise of ordinary care." Appellants say that the insufficient hypothesization in these respects gave the jury a roving commission to find for plaintiff "on any unspecified theory of liability which they might concoct." We think the submission was sufficiently specific; that the instructions properly submitted the ultimate facts constituting negligence, and that the jury was not given a roving commission.

■■■ Next, appellants complain of the admission in evidence of (a) testimony by Joseph Schrader that after the accident the partners arranged for the making of repairs to the ductwork, and his testimony as to the condition of the ductwork after it had fallen; (b) photographs of the ductwork taken after it had fallen and had been removed to a parking lot. The complaint is that because of the time lapse the evidence did not tend to show the conditions as they existed at the time of the installation of the ductwork three years before; that the fall may have changed or altered the ductwork and its fastenings. This evidence was admissible to show the type of construction, the presence or absence of straps, and what type of object struck plaintiff.

■■■ Appellants say the trial court erred in refusing to grant a new trial and they were deprived of a fair and impartial trial because of the conduct of venireman Nathaniel Bishop, who was selected as a juror and joined in the ten-member verdict. This general question was asked of the panel on voir dire examination: "Have any of you ever filed a claim against anyone for personal injuries involving any kind of an accident?" Bishop remained silent, notwithstanding he had received a back injury in an automobile collision six weeks before the instant trial; lost several days from work; received medical attention; incurred a $95 doctor bill; and had employed a lawyer the day after the collision, who immediately wrote and mailed a letter making claim against the driver of the other automobile, a claim settled after the instant trial for $800. Appellants discovered these facts and established them at a hearing on the motion for new trial, at which Bishop testified that there is a difference between "making" a claim and "filing" a claim; that to him "filing" a claim means filing it in court; that he had not spoken up because he had not *filed a claim in court*. Whether a verdict shall be set aside for failure of a venireman to disclose some fact on voir dire which might reasonably affect his qualification to sit as a juror is a matter primarily within the sound discretion of the trial court, Hornberger v. St. Louis Public Service Co., Mo. Sup., 353 S.W.2d 635, 642, whose action is conclusive "unless an abuse of discretion unmistakably appears." Reich v. Thompson, 346 Mo. 577, 142 S.W.2d 486, 129 A.L.R. 795. In Barb v. Farmers Insurance Exchange, Mo.Sup., 281 S.W.2d 297, counsel inquired of the panel on voir dire as to any claims the veniremen or their relatives may have had against others for personal injury or property damage. Two veniremen remained silent although both of them had had motor vehicular accidents and one of them and a relative of the other had been paid sums in settlement. This Court held that since the testimony of the veniremen "indicates that these veniremen did not precisely

understand what it was counsel meant by the word 'claim,'" or had momentarily forgotten the accidents in which they had been involved, the trial court was justified in believing that there was no intentional concealment, misrepresentation, deception and prejudice. And see Thompson v. Quarles, Tex.Civ.App., 297 S.W.2d 321, where on voir dire examination the jury was not questioned generally in respect to "all prior claims for personal injuries" but only in respect to "past or present lawsuits based thereon." Bishop's highly refined distinction between making and filing a claim provided the trial court with a basis for the exercise of its discretion in favor of a finding of no intentional concealment. Because of this, and because a scrupulous examination of the record reveals nothing upon which one's finger can be put to indicate actual prejudice on the part of the juror, we cannot conscientiously conclude that an abuse of discretion unmistakably appears.

Appellants claim the verdict is excessive by $5,000 and that the court erred in refusing to order a remittitur. Plaintiff was 46 years old. He was healthy and in good physical condition. He coached children's teams and played baseball, badminton, ping-pong, stepball and soccer. He was very active at home and at work. He had been employed by General Motors as a stock attendant since January, 1941. When the ductwork struck him it hit him on the head, glanced to his shoulder, and knocked him to the floor, with his leg doubled up underneath his body. The blow caused a compression fracture of the first lumbar vertebra. Bleeding from the head, in pain and unable to arise, he was placed on a stretcher and taken to the hospital, X-rayed, placed in a Jewett brace, and his bed adjusted to a hyperextension position. He had a wound or open cut on his head; pain in his right shoulder, neck and back, dizziness, blackouts. Pain in his back and side was constant. He spent three weeks in the hospital, receiving heat treatments, massage to the shoulders, and mild head traction to relieve muscle spasm. After returning home he slept with a hump in his bed for nine weeks. He saw Doctor Roche every two weeks for two months, then every three weeks until October, then periodically. He wore the Jewett brace constantly for approximately four months, and thereafter a half a day on and a half a day off until August 4, 1958. He had constant pain in his back, neck and shoulders. His loss of wages approximated $2036. He returned to work on August 4, 1958 at a lighter type of employment, as a unitizer, at a reduced rate of pay. The cost of the Jewett brace was $86.70. A bedspring and mattress cost $153. A bedboard cost $5.52. Dr. Roche's bill was $424; that of Dr. Mueller, $110. The bill for X rays was $245. The hospital bill was $378.60. Eyeglasses broken by the falling ductwork cost plaintiff $29.68. At trial time plaintiff continued to suffer from dizziness, constant pain in the back and neck, periodic headaches, inability to turn his neck, and pain in his shoulder blade. His hips have stiffened, and when he turns he must turn his whole body. He loses sleep at night and has trouble getting in and out of automobiles. The pains in his neck and back are aggravated by any activity. He has suffered a change of personality. Before the accident he was easy to get along with, but now he is difficult; has become sarcastic—"very short and to the point." His children irritate him. He "goes off to himself"; has crying spells two or three times a month, sometimes in the presence of his family. After testifying, he wept. After walking two blocks or so he is "all out of wind" and tired, and such a walk generates pain in his neck and back. He no longer participates in sporting activities. Plaintiff's posture is not erect. He walks "bent over"; looks emaciated and is extremely nervous. The family doctor testified that the fracture of the spine caused his troubles; that plaintiff was "not the same man" he had known before the accident. Dr. Roche testified plaintiff has limitation of ability to rotate his head to the right, and stated the accident aggravated a pre-existing arthritic condition and is accountable to a degree for his present complaints; that it would not be wise for

him to do sustained labor where he would have to lift weights of from one pound to 150 pounds, and that the plaintiff had reached his maximum benefit from medical treatment. To Dr. Mueller plaintiff complained that he was nervous, tense, irritable; that he would "go to pieces," get shaky; that he could not listen to people and their problems; that he had crying spells; that he had no sex relationship except once in three months; that lifting and stretching causes a pull in his back, a pain in the lower back, and that if he pulls his head down after being up, he gets dizzy; that he cannot get comfortable in bed, and feels "tired and beat up" when he arises in the morning. While Dr. Mueller could find no sensory or reflex changes, he found him restricted in his activities; that his body and head move as one mass; that he turns his head slowly, carries himself in a rather stiff position; and that he has a "tensional state," a psychiatric condition or illness that "may tend to hang over and be present for some time," although the doctor could not be definite about its duration. Dr. Funsch, testifying for defendant, noted that plaintiff appeared quite tense and complained of discomfort in the soft tissues in the back on the right side of the neck extending into the right shoulder girdle; discomfort over the soft tissues in the left flank and over the lumbo-sacral joint upon palpation; a mild diffuse soft tissue contracture over the low back; a slight impairment of motion of the spine as demonstrated on the flexion-extension films. He affirmed soft tissue involvement in his neck and in areas of his spine and that his complaints were attributable at least in part to his injury and the prolonged use of the brace; that plaintiff would have discomfort in his back for a further period; that plaintiff was pretty tense and would benefit from neurological treatment; that there is still some wedging of the first lumbar vertebra; that a person with arthritis may take a greater time to recover; that plaintiff would have discomfort four years after the accident and "a little more fatigueability than the next man."

Appellants cite and rely upon Miller v. Multiplex Faucet Co., Mo.Sup., 315 S.W.2d 224, and Osburn v. Kansas City Southern Ry. Co., 360 Mo. 813, 230 S.W.2d 856, in neither of which did plaintiff sustain a fracture. We have considered the injuries sustained by Miller and Osburn in comparison with the injuries sustained by Begley, as well as the cases cited by respondent, Hoelzel v. Chicago, R. I. & P. Ry. Co., 337 Mo. 61, 85 S.W.2d 126; Martin v. Kansas City, Mo.Sup., 340 S.W.2d 645; Triplett v. Beeler, Mo.Sup., 268 S.W.2d 814; Lesch v. Terminal R. R. Ass'n of St. Louis, Mo. Sup., 258 S.W.2d 686, and Abernathy v. St. Louis-San Francisco Ry. Co., Mo.Sup., 237 S.W.2d 161. Balancing all of the pertinent factors, we have concluded there was no error in refusing to order a $5000 remittitur; that considering plaintiff's age, condition of previous health and activity, the nature of the injury, the pain and suffering experienced and to be experienced in the future, the length of the plaintiff's stay in the hospital, the period of his total disability, the reduction in the grade of his employment, his psychiatric involvement, the resulting limitation of his physical activity, past and future, the items of special damages, including loss of wages, the purchasing power of the dollar, and all the other factors properly to be weighed, a verdict for $20,000 is not excessive.

Appellants contend it was error to give Instruction No. 15 which authorized the jury to award damages for the X-ray, hospital and doctor bills, for the reason that plaintiff failed to prove that these bills rendered were reasonable; that the court should have ordered a remittitur as to them. There was no evidence that these bills had been paid, or that they were reasonable in amount. Respondent says the reasonableness of the various medical expense items was not a contested issue; that the brace, mattress and springs, bedboard and eyeglasses were paid for and that evidence of payment will support an instruction on medical expenses, without proof of reasonableness, under Gooch v. Avsco, Inc., Mo.Sup.,

340 S.W.2d 665, 668, 669; Myers v. Karchmer, Mo.Sup., 313 S.W.2d 697, 706, 707; and Cordray v. City of Brookfield, 334 Mo. 249, 65 S.W.2d 938, 941; that an acknowledgment of the indebtedness authorizes the submission of an instruction allowing damages for medical charges, under Cordray v. City of Brookfield, supra, and Cordray v. City of Brookfield, Mo.Sup., 88 S.W.2d 161, 164. The reasonableness of the bills, however, was a contested issue. Evidence as to the amounts of the doctors' bills was objected to on the ground that they improperly included the cost of preparing for trial, and we find no concession that otherwise they were reasonable. There was no acknowledgment of the indebtedness of the X-ray, doctor and hospital bills. Doctors' bills, Vogelgesang v. Waelder, Mo.App., 238 S.W. 2d 849, 857, and hospitalization, Bauman v. Conrad, Mo.App., 342 S.W.2d 284, 290, are items of special damage, and to be allowed must be supported by substantial evidence of their reasonable value. The same applies to X-ray bills. In the absence of evidence of reasonable value, Dr. Roche's bill ($424), Dr. Mueller's bill ($110), the X-ray bill ($245) and St. John's Hospital bill ($378.-60), should have been remitted, in the total sum of $1157.60.

The verdict of the jury finding the issues for plaintiff "and against both of the defendants" is said to be erroneous and insufficient to sustain a verdict against any defendant, because it cannot be determined which two of the three defendants (Saul Rubin, Louis Rubin or Adaber Realty & Investment Company) were included and which one of them was excluded from the verdict. Two entities were sued, a partnership and a corporation. There was a separate submission by separate instructions against each. Instruction No. 1 authorized a verdict against Saul Rubin and Louis Rubin, as partners. Instruction No. 3 authorized a verdict against the corporation. Construing the verdict liberally, Thorne v. Thorne, Mo.Sup., 350 S.W.2d 754, 757[3], we experience no difficulty in concluding that the clear intent of the jury by this verdict was to find the issues against both entities and to return a verdict against Saul Rubin and Louis Rubin, as partners, and against the corporation, notwithstanding the jury's intent was inartfully expressed.

Accordingly, if plaintiff within 15 days shall enter here a remittitur of $1157.60 the judgment shall stand affirmed for $18,842.40 as of the date of its rendition; and otherwise the judgment will be reversed and the cause remanded. It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.