**R.W. GAST and Marjorie Gast, Plaintiffs/Appellants,**

**v.**

**SHELL OIL COMPANY and James Becker, Defendants,**

**and**

**Henty Construction Company, Inc., Defendant/Respondent.**

**No. 73553.**

Supreme Court of Missouri, En Banc.

Nov. 19, 1991.

As Modified on Denial of Rehearing Dec. 17, 1991.

Canice Timothy Rice, Jr., Margaret E. Zapf, St. Louis, for plaintiffs, appellants.

Ralph V. Hart, St. Louis, for defendant, respondent.

Ronald D. White, Rolla, Joseph W. Rigler, Salem, for amicus curiae MATA.

Jeffrey P. Ray, Jennifer H. McCoy, Kansas City, for amici curiae Mo. Org. of Defense Lawyers.

BLACKMAR, Judge.

Linda Gast, a cashier at a 24–hour self-service gasoline station, was shot to death in the course of a daytime robbery. Her parents seek damages for her wrongful death from the contractor who converted a service bay into a cashier's room. The trial court directed a verdict for the defendant at the close of the evidence.[1] The court of appeals reversed and remanded for trial, relying largely on the opinion in *Honey v. Barnes Hospital*, 708 S.W.2d 686, 700 (Mo. App.1986). We granted transfer to consider the scope of the contractor's duty to third persons suffering injury on the premises following completion and acceptance of the work, and now affirm the direction of a verdict by the trial court.

In determining whether the plaintiffs made a case, we of course consider all the evidence in the record which supports submissibility and give the plaintiffs the benefit of all reasonable inferences from the evidence. The trial court sustained numerous objections to the plaintiffs' evidence, and we also accept rejected evidence which is covered by proper offers of proof. Where the plaintiffs introduced testimony which has potentially adverse effect, we take this evidence as true except when it is contradicted by other evidence.[2]

---

1. The defendant moved for a directed verdict at the close of the plaintiffs' case, but the court did not rule on the motion until the defendant rested. The plaintiffs cannot complain that they were deprived of the opportunity to present rebuttal evidence because they offered no such evidence.

2. *See Duke v. Missouri Pac. Ry. Co.,* 303 S.W.2d 613, 616 (Mo.1957); *Higgins v. Knickmeyer-Fleer Realty and Inv. Co.,* 335 Mo. 1010, 74

The facility is located at 12th Street (Tucker Boulevard) and Delmar Boulevard, in the City of St. Louis. It is owned by Shell Oil Company and operated by a lessee. In 1977, Shell decided to convert one of the service bays into a secure cashier's room so that the facility could be safely operated on a 24-hour basis. Shell prepared a one-page specification sheet which was used by defendant Henty Construction Company, Inc. as a basis for bidding the job. The specifications provided that, except as otherwise stated, "New office to be exactly the same as that at 4600 Jennings at I–70;" "permit by Shell;" and "Reuse extg. door to service room. Need new locks and pull handle." The contract was awarded to Henty. Henty bid $4,672 for the job and realized a profit of about $1,100.

Henty has been engaged in the construction business in St. Louis for a number of years. It hires carpenters and laborers but subcontracts work requiring the services of other specialists. It employs no architects, engineers or designers and does not design buildings or facilities. There is no evidence that it holds itself out as an expert in the design of secure facilities. It simply sought to perform the contract for the cashier's room in accordance with Shell's specifications. Shell had blueprints of the Delmar facility, which may have accompanied the application for the building permit it was required to obtain, and also had blueprints of the Jennings facility, but Henty prepared no blueprints and did not examine or make use of Shell's. Shell's project engineer was on the construction site during the work, and testified that he was aware of the work Henty was doing. The work was completed by the contractor and accepted by Shell in January of 1978.

The robbery occurred on Monday, July 20, 1981, about 4:25 P.M. Linda, the only employee on the premises, was in the cashier's room with the door locked. This room adjoined an area containing vending machines to which the public had access. A gasoline customer would make payment by going through the vending machine area to the cashier's window. The door to the cashier's room contained a bullet resistant glass window and a pass-through slot. On the fatal day, three teenage robbers entered the vending area. One of them kicked in the door to the cashier's booth with a single kick, causing the deadbolt lock assembly to be ripped from the door frame. The robbers shot Linda and rifled the cash register.

The plaintiffs claim that the contract was performed negligently in three respects, as follows: (1) the door between the cashier's booth and the vending machine area was hollow rather than solid; (2) the door was hung so as to open inward, rather than outward into the vending area; and (3) the strike plate for the deadbolt lock was insufficiently secured, in that it was not reinforced by a metal plate in the frame, and that it was secured by screws that extended only into the door frame rather than into the adjoining wall. Plaintiffs offered expert testimony to show deviation from good construction standards in each of these respects. The witness testified that the break-in would at least have required more time if proper practice had been followed. For present purposes we will accept the proffered expert testimony, including the portions to which the trial judge sustained objections.

The first inquiry must be as to the duty owed to the plaintiffs by the defendant. This is a question of law. The court of appeals placed its essential reliance on

S.W.2d 805, 812 (1934); *State ex rel. Highway and Transp. Comm'n. v. Keeley*, 780 S.W.2d 84, 87 (Mo.App.1989); *Zahorsky v. Griffin, Dysart, Taylor, Penner & Lay, P.C.*, 690 S.W.2d 144, 147 (Mo.App.1985). The dissent suggests that this opinion "overlooks a number of salient facts and ignores reasonable inferences supportive of the submission...." This opinion turns on the nature of the contractor's duty. We do not disagree with anything that is stated in the dis-

sent's lengthy recitation of facts. The record shows, nonetheless, that the owner did not rely on the contractor's expertise, but rather retained the contractor to effect the improvements according to its directions. The owner then accepted and paid for the work. There is no evidence of such a concealed defect as to render the contractor liable to third persons following acceptance.

*Honey,* which states a general rule as follows:

> After the owner accepts a structure, the general rule is that a general contractor is not liable to persons with whom he did not contract....

*Honey,* 708 S.W.2d at 700.

This rule is enunciated in a series of Missouri cases. An instructive case is *Gruhalla v. George Moeller Construction Co.,* 391 S.W.2d 585 (Mo.App.1965). In *Gruhalla,* a school visitor stepped in a hole in the floor in a dark vestibule, and sought to impose liability on a contractor who had done work on the vestibule. The court held that the contractor was not liable for injury occurring after the owner had accepted the construction work. *Id.* at 597. *See also Frogge v. Nyquist Plumbing and Ditching Co.,* 453 S.W.2d 913, 916 (Mo.1970) (stating the "very general rule"); *Restatement (Second) of Torts § 385 comment d (1965).*

In *Honey v. Barnes Hospital,* 708 S.W.2d 686 (Mo.App.1986), a mental patient opened a window in the psychiatric ward of a hospital and plunged to his death. The court of appeals affirmed a judgment against the hospital, the general contractor who had installed the windows, and the supplier of the windows. The specifications provided that "life safety hardware shall provide clean opening between sash and frame of 3 to 5 inches" and that sash openings for the Psychiatric Floor "shall be controlled to a fail-safe position." The court of appeals found that the windows could be opened wide enough to permit the patient to get through them and that the jury could have found that the specifications were violated in this respect. It also found that the violations were concealed so that they could not be discovered by the owner's visual inspection. The court therefore concluded that the claim against the general contractor, based on the very kind of injury the specifications were designed to prevent, fell within an exception to the general rule stated by this Court in *Begley v. Andaber Realty and Inv. Co.,* 358 S.W.2d 785, 791 (Mo.1962), as follows:

> This exception applies where the structure was so defectively constructed as to be essentially and imminently dangerous to the safety of others; the defects are so hidden and concealed that a reasonably careful inspection would not have disclosed them, and these things are known to the defendants but not to those who accepted them.

In *Begley,* a customer of a supermarket was injured when 80 feet of overhead ductwork fell on him. The evidence supported a finding that the installation was defective, that the contractor knew or should have known of the defect, and that the defective condition was not known to the tenant in possession of the building.

The case before us is clearly distinguishable from *Honey* and *Begley.* We assume for present purposes, without assessing the legal significance, that the contractor knew that the purpose of the construction was to protect the cashier from criminal activity, and that the possibility of violent criminal activity at the site was anticipated. Henty's undertaking, nevertheless, was simply to effect the modification to the facility in accordance with the owner's specifications, and the owner accepted the work. Any departure from specifications which is known to the owner would be condoned by knowing acceptance.

Henty cannot be faulted for using the hollow door, because the specifications directed that this be done. Even if the door could have been installed elsewhere, it was hung where it had hung before and the owner accepted the work knowing where it was located. It is of no moment that the contractor could have hung the door so that it would swing outward, or that the door at Jennings opened outward, because the door at Delmar obviously swung inward and the owner surely knew how it was hung when it accepted the work. Nor do the plaintiffs make a case simply by showing that Henty procured the locking mechanism and the screws, that nothing in the specifications would have precluded the use of longer screws, and that the owner did not know the length of the screws actually used. The screws which were used were not contrary to specifications. The contractor, indeed, could have complied

with the specifications by using screws "exactly the same" as those used at the Jennings station, and there is no evidence that the screws were not the same.[3] The same is true of the absence of a reinforcing metal plate in the door frame. No evidence showed that the Jennings station door had such a plate. There is absolutely nothing to show that the owner relied on the expertise of the contractor as to the proper design of the modification; thus, suggestions about how the contractor might have advised the owner are inappropriate. The use of the shorter screws does not establish an "imminently dangerous" situation within the compass of the *Begley* holding, in which there was a continuing danger that heavy pipes would fall on customers.

*State Farm Insurance Company v. Nu Prime Roll–A–Way of Miami, Inc.,* 557 So.2d 107 (Fla.App.1990), in which a burglar entered a dwelling by forcing its window shutters open is distinguishable in that the supplier had advertised that the shutters would prevent break-ins.

■ The plaintiffs do not rest their legal argument with *Honey.* They urge us to adopt a "modern rule," in which, it is suggested, acceptance by the owner does not terminate the liability of the contractor for negligent construction, citing *Restatement (Second) of Torts § 385 (1965);* 3 Harper, James, and Gray, *The Law of Torts (2d ed. 1986)* § 18.5, at 705–11, and the writings of other commentators. They also present strings of citations which are said to apply this modern rule. We have thoroughly examined the cases cited. Our task has been the more difficult because the plaintiffs do not discuss the facts of the cases and the defendant fails to provide any response. Our examination persuades us that the prevailing case law is not substantially different from the law enunciated in our cases. Acceptance is still a significant event. *See Restatement (Second) of Torts, § 385 comment d (1965).* Some of the cited cases involve departure from specifications that

could not be discovered by reasonable investigation. *Honey* recognized liability in such a situation. Others involve a dangerous character of the structure or condition, unknown to the owner, which appropriately describes the facts on the basis of which *Begley* imposed liability. A similar situation was presented in *Casey v. Hoover,* 114 Mo.App. 47, 89 S.W. 330 (1905), which held that a contractor could be liable for hidden defects in a bridge which were not discoverable by the proprietor. In the present case, the contractor's undertaking was to follow the owner's specifications. The project of providing a secure place for the cashier was the owner's. The contractor owed no duty to the lessee's employees with respect to the design of the modifications. We cannot say that the specifications are "so imperfect or improper that the ... contractor should realize that the work done thereunder will make the structure or condition unsafe ..." *Restatement (Second) of Torts, § 384, comment f (1965).* We believe that our conclusion is consistent with the prevailing law.

■ The plaintiffs point to *§ 516.097, RSMo 1986,* which is the so-called "statute of repose" for claims against architects, professional engineers, and contractors for "a defective or unsafe condition of any improvement to real property, ..." and suggest that this statute and its counterparts in other states connote a widened scope of liability for defective or unsafe conditions and a realization that claims may be presented long after the construction is completed and accepted. It suffices to say that statutes of limitations are procedural enactments which are not designed to impose or to define the scope of substantive liability.

The trial judge was correct in directing a verdict. The judgment is affirmed.

ROBERTSON, C.J., and COVINGTON, HOLSTEIN and BENTON, JJ., concur.

3. Shell's representative, called as a witness by plaintiffs, testified that he was aware of the kind of lock and hardware Henty was buying and putting on the door, although he did not recall whether he saw the actual lock and hardware used prior to installation. This testimony is undisputed on the record.

RENDLEN, J., dissents in separate opinion filed.

SHRUM, Special Judge, dissents and concurs in dissenting opinion of RENDLEN, J.

THOMAS, J., not participating because not a member of the Court when case was submitted.

RENDLEN, Judge, dissenting.

For the reasons following, I respectfully dissent. At the close of plaintiffs' evidence, the trial court erroneously directed a verdict for defendant Henty Construction Company and against the plaintiffs, R.W. and Marjorie Gast. Linda Gast, a.k.a. Linda Coleman,[1] was 28 years old at the time of the tragic events which ended her life. She had obtained a bachelor degree from the School of the Ozarks, a teaching certificate from Harris–Stowe Teachers' College and was working part-time as a teacher's aide for the city school system. She worked nights and weekends at a Shell gas station located at the corner of North Tucker Boulevard (12th Street) and Delmar. Gast's parents, plaintiffs/appellants, brought this action for the wrongful death of their daughter.

The majority, affirming the judgment of the trial court, mistakenly concludes the plaintiffs failed to make a submissible case and in so doing overlooks a number of salient facts and ignores reasonable inferences supportive of the submission. Such is not our proper function; instead when reviewing the trial court's drastic action, we are to consider all the favorable evidence together with the reasonable inferences drawn therefrom in the light most felicitous to the plaintiffs. *Rustici v. Wiedemeyer,* 673 S.W.2d 762, 765 (Mo. banc 1984).[2] The record reveals the following facts which I submit made a submissible case. Plaintiffs proceeded under the theory that a building contractor, knowing it was hired to construct a safe room with bulletproof glass, a pass-through *slot,* and a retractable cash drawer for a gasoline service station in a high-risk area of downtown St. Louis for the avowed purpose of providing cashiers protection from crime while working in the station, can be responsible in tort for injuries received as a result of the criminal acts of a third party. Liability attaches because such criminal acts are reasonably foreseeable and are precisely of the sort necessitating construction of the "safe" room.

In 1977, Henty Construction Company was a fairly large commercial and industrial construction company working principally on shopping malls and similar projects. At that time, Donald Cissell was the project manager for Shell Oil Company, (Shell Oil) overseeing modifications to its 12th and Delmar gas station.

Cissell, project manager for Shell Oil, contacted Henty Construction and through its estimator and project manager, Thomas Meier, was informed of the Shell Oil remodeling project at its 12th and Delmar station. At that time, Cissell relayed to Meier that the work was "[t]o provide a secure area for the cashier."

The modification called for the construction of a small room from which a single cashier could handle transactions with customers. A bulletproof window was to be placed in the wall facing the pumps and a retractable cash drawer beneath the bulletproof glass through which customers' payments were received. There was also a small "refreshment area" to which the station's customers had access. The cashier's

---

**1.** Ms. Gast had been married to Bracy Coleman; however, the court found that since Mr. Coleman had never divorced his prior wife, his marriage to Linda Coleman was invalid.

**2.** Although, the majority does not incorrectly state the law on this matter, the extrapolation drawn that "where the plaintiffs introduce testimony which has potentially adverse effect" is taken as true "except when it is refuted by other evidence" is not supported by the authorities.

*Duke v. Missouri Pacific Ry. Co.,* 303 S.W.2d 613 (Mo.1957), cited by the majority, actually states: "While plaintiff is entitled to the most favorable view of the established facts and inferences in support of his claim upon a motion for directed verdict, the review is not limited to isolated facts but embraces a consideration of the whole of the evidence adduced on behalf of plaintiff and conceded facts are not to be disregarded." *Id.,* at 617.

room was separated from this area by a protective door and this door was also to have a bulletproof glass window and a "pass-through slot" for payments. It is the questionable construction of this protective door which gave rise to this action.

There was some dispute as to the materials Meier had before him when he was working on the estimate, but it was he who prepared the job estimates and submitted Henty's bid. Concerning a blueprint which was excluded by the trial court, Meier, when deposed, conceded the following:

Q: Do you recall whether you had this blueprint prior to your bidding the job?

A: I would have had it before bidding if that's the same.[3]

However, there is no question that Meier had at that time before him the specification sheet prepared by Cissell. This sheet reads in pertinent part: "(1) New office to be *exactly* the same as that at 4600 Jennings at I-70, Jennings, Mo., with the following exceptions: (emphasis added)." None of the exceptions listed refer to the doors of the office. The last line of the specification sheet provides: "(9) Reuse Extg. door to service room. Need new locks & pull handle." Further, Cissell told Meier to go to the Jennings gas station and "observe the cashier's booth". At no time did Cissell direct any employee of Henty Construction as to the type of locks, screws, other hardware, lumber, doors or other materials to be employed. Throughout the construction, Meier and Cissell were the principal contacts for the contractor and the owner.

Henty Construction and Shell Oil entered into the contract November 14, 1977, which called for Henty to "Construct office in first bay of service room at 721 North 12th at Delmar, St. Louis, Mo. in accordance with specification sheet dated 11/14/77." Henty declared "we propose to complete the work described above for the sum of $ four thousand six hundred seventy two dollars ($4672.00). We will complete the work in 30 consecutive calendar days from the date ordered to commence work."

The specification sheet Shell provided instructed defendant to reuse the existing door. This door was a hollow-core door rather than of solid wood and defendant knew full well of its flimsy character, when they cut into the door and installed bulletproof glass. Further, Henty knew or should have known this could not possibly provide "security" for the cashier which was the very reason defendant had been employed under the contract.

The cashier's room was also constructed with an opening to a storage room, an area not accessible to the public. The specification sheet was ambiguous and did not specify where the existing hollow-core wood door was to be used, i.e., on the opening to the public refreshment area or in the opening to the storage room. Defendant argues this permitted it to place the door in the opening leading from the refreshment area into the cashier's room, but it was not so required by the specification sheet and this ambiguity certainly presented a fact issue for the jury to consider. The specification sheet did state that new locks and a pull handle would be needed for a door but it did not specify the type of locks and hardware to be used by the contractor, and it *did not* indicate whether either door should open in or away from the cashier's room. Here, too, was an ambiguity presenting a fact issue for the jury. The only instructions which defendant admits it was given were the one-page specification sheet and oral communications from Cissell.

The Jennings station, like the Delmar station, has two doors to the cashier's room. Critical here is the fact that the door to the small refreshment area to

---

3. The referenced blueprint is Plaintiff's exhibit 34 which the trial court excluded because Meier testified at trial he did not remember having it before him during work on the job. However, this was the blueprint prepared by Shell Oil Company in preparation to get a building permit for the gas station construction. And as noted above, Henty's project manager admitted that he "would have had" this blueprint before bidding on the project. The blueprint shows that the cashier's office was to have two "NEW SOLID WOOD DOOR[s]" which both swing out from the cashier's room.

which the public had access was a solid-core door hinged to swing *out* to the refreshment area. Meier admitted he visited the Jennings station but claimed not to remember noticing the type of door or the locking mechanisms used on the station doors. The jury, knowing he had gone to the Jennings station to inspect that installation in connection with the alterations at the Delmar station, could reasonably conclude he knew or should have known the door from the cashier's room swung out to the public refreshment area. Meier further testified that he did talk to "Shell engineers as to what to purchase" but could not remember anything specific said during these talks. This assertion was impeached by statements in his deposition in which he admitted he could recall no other special instructions by Shell Oil as to any of the purchases made.

When Henty began construction, it necessarily learned the Delmar station had a hollow-core door swinging into the cashier's room from the refreshment area and at that time Henty purchased a solid-core door and "locking hardware" consisting of a double cylinder deadbolt. Meier testified he did not know the length of the screws used to attach the deadbolt or the strike plate to the door frame, but stated that whatever was furnished with the deadbolt when purchased was used. He admitted, however, in his deposition that the screws were probably only three-quarters or one inch in length. The fact that these short screws were employed at the critical point where the lock and strike plate were affixed were, of course, known to Henty but not to Shell Oil. Further, Henty could reasonably be found to have knowledge that such short screws would reach only into the soft wood door frames and not into the 2 × 4 wall studs. However any inspection by representatives of Shell Oil after completion of the installation would reveal only the screw heads and not give Shell notice of this inherently dangerous condition when it accepted the work of Henty. No test was performed on the door other than to see if the deadbolt worked and no other security check was made of the door.

Henty took about four weeks, with a total of 82 manhours, to complete the project.

Testimony was elicited at trial that workers for Henty took the *hollow-core door* at the Delmar station from its hinges, cut a hole in the door for installation of a bullet-proof glass window, cut another hole for a pass-through security slot. They then re-hung the door in its original position. The hollow-core door consisted of a cardboard center in a honeycomb configuration and only the faces and perimeter were of wood. The newly purchased solid-core door was installed in the doorway from the cashier's office into the storage area to which the public had no access. Any question as to the flimsy character of the hollow-core door was dispelled when the opening was cut to insert the bulletproof glass panel therein. It strains credulity that a careful contractor employed to construct a security system with a safe room for cashiers would install a hollow-core door as the only barrier from the public area, but it staggers belief that a responsible contractor would install bulletproof glass in such a door and use screws of only three-quarters to one inch in length to fasten the strike plates to the door frames, further to omit installing any extra reinforcing plate beneath the strike plate. And finally, the jury could conclude no careful contractor would hang the door so it would swing inward, virtually inviting an assailant to kick it open to get at the money in the cashier's room.

On completion, Cissell was called to the site to survey the work, but he did not know at the time the original door which had been painted, apparently with enamel, was hollow-core. Though he could observe the hardware and locks used on the "security door", he did not and could not reasonably be expected to know the length of the screws employed in fastening the strike plate to the door frame nor whether there was a reinforcing plate placed beneath the strike plate.

There were no changes in the door, frame or locks until the fatal shooting. On the afternoon of July 20, 1981, Linda Sue Gast was working in the cashier's office of the Delmar station and about 5:00 p.m.,

three teenage youths entered the Delmar station. Linda was inside the cashier's room and the so-called "security door" was locked. The largest youth of the group (at 5′11″ and 165 lbs.) kicked the door in with a single kick, they announced a holdup and one of them took the money while another held Linda at gunpoint. Sometime during the robbery, one of the assailants shot and killed her.

Officer George Raterman, an evidence technician for the St. Louis City police department, arrived at the crime scene shortly after the shooting. He noticed the door frame of the "security door" was broken in the area where the deadbolt lock met the frame and that the deadbolt was in the locked position, with the bolt extending from the door, and the keys were hanging from the lock on the cashier's side. Raterman described the door as a hollow-core wooden door made of soft wood, perhaps pine or fir, and hinged to swing into the cashier's office. The door frame was also made of soft wood with no reinforcing plate mounted under the strike plate. By visual inspection Raterman could not at first determine the type of wood in the door because it had been painted with an enamel and only by examining the cracks in the door was he able to determine it was of soft wood. After the door was removed from its hinges, the witness realized the door was a hollow core. The trial court would not permit Raterman to opine as to the "security" quality of the door, but the detailed recital of facts provided a suitable base for submission of that issue to the jury.

At trial, the Gasts called as their expert witness, Ronald Henges, a manufacturer of prefabricated building materials and a building contractor for interior construction. On inspecting the door, Henges found that the area around the deadbolt had broken because of inherent weakness in the door which, in his opinion, would not have split had it been a solid-core door. Asked to assume all the facts regarding the door (i.e., hollow-core door, hinged so as to swing into the cashier's office, made of soft southern pine, locked with a single

deadbolt lock of less than an inch long, with a single strike plate fastened to the door with only a couple of one-inch screws) and whether such would withstand a kick by a 5′ 11″ and 165 lbs. teenage boy, Henges replied: "My opinion is that the door as you have described would not withstand a kick, kicking or kick, even maybe one kick from the people you described. The door would either fail or the frame would fail or both would fail." Henges testified that the door frame and the hardware used to attach the strike plate to the door failed. Henges testified that to attach the strike plate through the door frame (apparently of soft pine) to the underlying studs would take a screw of at least 2½″, a very common, inexpensive item which could take no more than a minute longer to install than the short screws Henty used. The weakest element of the security door was the "frame and the hardware attached to the frame." In re-cross examination, Henges testified, "In this particular case I believe that Henty's men had every reason to inform Shell that in their professional opinion it did not think this was a proper assembly, and if Shell then said proceed per our instructions, you know, this is what we want, this is the way we've instructed you, then to go forward with that."

Henges also testified that if the simple precaution of using three-inch rather than one-inch screws had been employed to fasten the strike plate the lock might have failed ultimately but that it would have survived a number of kicks. The trial judge sustained Henty's objections and refused all the various exhibits of alternative means of securing the lock, strike plate, types of doors and specs as to other hardware (a total of 15 exhibits).

Plaintiffs premised their claim of negligence on three aspects of defendant's conduct: (1) in not properly anchoring with suitably long screws the deadbolt strike plate or receptacle to the two-by-four studs beneath the door's frame, (2) in hanging the door so that it opened in toward the cashier's room and (3) in using the flimsy hollow-core door providing admittedly easy entrance from the public refreshment area.

Plaintiffs must show that Henty owed Linda Gast a duty to protect her from injury, that this duty was breached and this caused her death. *Madden v. C & K Barbecue Carryout, Inc.*, 758 S.W.2d 59, 61 (Mo. banc 1988). The specific question is whether Henty can be held liable for damages sustained as a result of the criminal conduct of a third party after Henty's work has been apparently accepted by his obligee, Shell Oil Company.

It should be noted that contractors owe a duty to exercise the care required of their profession to those with whom they are not in privity when injury to those third persons is foreseeable. *Honey v. Barnes Hospital*, 708 S.W.2d 686, 700 (Mo.App.1986). It has also been aptly stated that the touchstone for the creation of a duty is foreseeability. *Madden*, 758 S.W.2d at 62. The duty arises from circumstances in which there is a foreseeable likelihood that particular acts or omissions will cause harm or injury. *Id.* No reasonable contention can be made that the harm here inflicted was other than clearly foreseeable, and the jury most certainly could have so found.

In *Honey*, the general contractors who constructed a complete floor of a psychiatric ward were sued by the parents of a psychiatric patient who committed suicide by opening a window and jumping out. Plaintiffs charged the contractor negligently installed the windows which allowed them to be opened by the deceased and the court held that injury to psychiatric ward patients was foreseeable if the windows which were supposed to be locked could be easily opened. *Honey*, 708 S.W.2d at 700.

Similarly, in *State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami, Inc.*, 557 So.2d 107 (Fla.Dist.Ct.App.1990), the Florida court found that defendant, a manufacturer of window shutters, could reasonably foresee the act of a criminal forcing open its window shutters and gaining access to the plaintiff's unoccupied home. The defendant had advertised the shutters as sufficient to prevent break-ins, yet a break-in was precisely what had occurred. *Id.* By the same token, in the case at bar, Henty had contracted to construct an enclosure

for Shell Oil's cashiers so they would be "secure" while working. Respondent was instructed and did install bulletproof glass in a door and the outside wall for the express purpose of insulating the cashier from dangerous persons. That an armed robbery was likely to occur was not only foreseeable, it was the very reason for remodeling the building.

Henty asserts its only duty was to follow the specifications of Shell Oil and, having done so, its duty to appellant ceased upon Shell's acceptance of the work. I find this argument nonpersuasive because Shell's instructions were both incomplete and ambiguous, leaving respondent the authority and responsibility to construct the room to accomplish Shell's single express purpose—security.

In *Honey*, the court stated that an exception to the general rule which relieved the contractor of liability after acceptance by the owner existed where: 1) the structure is so defectively constructed so as to be imminently dangerous to the safety of others; 2) the defects are so hidden and concealed that a reasonably careful inspection would not have disclosed them; and 3) the defect is known to the contractor but not to the party who accepts the structure. *Honey*, 708 S.W.2d at 700.

Plaintiffs aptly note that the court in *Singleton v. Charlebois Construction Co.*, 690 S.W.2d 845 (Mo.App.1985), recognized section 385 of the Restatement of Torts (2nd) which reads:

> One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others upon or outside of the land for physical harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others.

Restatement of Torts (2nd) § 385; *Singleton*, 690 S.W.2d at 849.

In *Honey*, the court found that the window on the psychiatric ward was imminent-

ly dangerous to the safety of psychiatric patients inasmuch as it might appear locked when, in fact, it was not. In addition, employers of the contractor inspected the windows and determined that they were locked, yet later that evening, the decedent was able to open and jump from the window. From this it could be inferred that a reasonable inspection would not have disclosed the defect. *Id.* Further, the court in *Honey* noted that the contractor's employees knew the window could be opened without keys, yet when asked by an employee of the hospital, the contractor's employees related that the windows were safe. *Id.* The contractor knew of the defect and the owner did not.

The case at bar presents an even stronger case for applying the referenced rule. Given that Henty was told that the reason for the construction was security, constructing a door susceptible to forced entry with a single kick was surely as imminently dangerous to the occupant of the cashier's room as a readily unlocked window in a psychiatric ward would be to a psychiatric patient. Further, though there was evidence in our case that the owner, through Cissell, inspected the door visually and made sure the door locked when closed, the evidence established that his visual inspection could not have disclosed how the deadbolt was installed nor whether the door was of hollow-core construction. We find no mention in *Honey* that the owner actually conducted the inspection and while Shell could observe that the door swung in, the other results of Henty's faulty construction could not be discerned until after the break-in. Here, too, was a fact issue for the jury and the so-called waiver by Shell was for the trier of fact, not for the circuit judge to arbitrarily resolve.

Henty contends it merely followed the instructions and specifications of Shell, however, the evidence supported two bases for the liability of Henty: 1) that Henty was negligent in failing to exercise reasonable care as to matters not provided in the specifications or 2) that Henty negligently performed its obligations under its contract. The specification sheet does not state where the hollow-core door was to be used, though the majority infers that specification sheet contemplated its use at the opening between the cashier's room and refreshment area. At best, the specifications are ambiguous and presented an issue of fact. The trial court erred in denying the jury an opportunity to determine such issues of fact.

There was absolutely no reference in the specifications to the type of dead-bolt to be installed nor to the manner of its installation. Neither was there evidence adduced identifying the type of dead-bolt mechanism used at the Jennings store. Plaintiffs' expert did testify, however, that the door frame was broken in at the point of the dead-bolt as a result of a kick upon the door. Further, that had the dead-bolt receptacle been anchored to the studs, it would have at least prolonged the time necessary to kick open the door. The improper installation of the dead-bolt and strike plate alone is sufficient to raise a factual question appropriate for the jury.

Moreover, there was testimony that the Jennings Shell Station's doors opened out from the cashier's room. Defendant conceded that it was instructed to copy the Jennings store's layout—if it did not, it may be liable for its negligent failure to conform to the contract's requirements. *Honey,* 708 S.W.2d at 701.

Generally, a business is under no duty to protect against a deliberate criminal attack by an unknown third person. *Madden,* 758 S.W.2d at 61. Implicit in this argument is that if Shell could not be liable for failing to protect against the attack, neither could its obligor, Henty.

Henty cites *Madden* and similar cases for the proposition that for it to be duty-bound, prior acts of similar violence must have occurred at the Delmar location or have occurred in the surrounding area. See *Madden,* 758 S.W.2d at 62–63; *Keesee v. Freeman,* 772 S.W.2d 663 (Mo.App.1989). Without such evidence, Henty argues it cannot be said the incident was foreseeable; however, these cases have no application to the case at bar.

The existence of foreseeability was established not by examples of prior criminal activity but by Shell's decision that there was a high crime risk at its Delmar station and that it was necessary to construct a room to protect its employees from the very danger which occurred. In *Keenan v. Miriam Foundation*, 784 S.W.2d 298 (Mo. App.1990), the plaintiff arrived at defendant's, Miriam Foundation's, place of business to donate dishes to defendant's not-for-profit operation. Believing the area was one of high crime risk, plaintiff stated to an employee of defendant that she did not want to unload her donated goods at the rear entrance of the business. The employee assured her that someone would be there to assist her. However, while the two employees assisting her were inside the building with plaintiff's goods, two unknown men assaulted plaintiff, shot her in the leg and absconded with her purse.

In upholding the jury's verdict, the court noted that because defendant's employees assured plaintiff she would be "all right" and that "someone would be with her" while she unloaded her donated goods, defendants assumed a duty to provide for plaintiff's safety. *Id.* at 304. Because defendant assumed this duty, the jury could reasonably find that the duty had been breached. *Id.*

Similarly, Shell Oil assumed the duty of ensuring a secure work environment and contracted with respondent to construct the cashier's room accordingly.

Further, under this proof, a fact issue of proximate cause was raised. In *St. John Bank & Trust Co. v. City of St. John*, 679 S.W.2d 399 (Mo.App.1984), a St. John's City Policeman deliberately set fire to a theatre which had previously been subject to harassment by the St. John Police. The owner of the property, St. John Bank and Trust Company, sued the City for negligent supervision of the police department. One of the issues considered was whether the criminal act of arson was an independent intervening cause, precluding a finding of liability upon defendant. *Id.* at 403.

In determining that the criminal conduct was not an intervening cause, the court stated that an act is not independent "if the failure to take care to prevent it is what makes the actor negligent." *Id.* Because the evidence supported the inference that the arson was simply the culmination of the harassment of the theatre, the failure to take steps to prevent the arson was the essence of negligent conduct. *Id.*

Here, the duty arose because Shell endeavored to construct a secure work environment for Linda and her colleagues. The failure to ensure that type of environment, if factually a negligent one, is precisely what plaintiffs assert caused Linda's fatal injuries. The criminal conduct was not, as a matter of law, an intervening cause, *id.*, and the foreseeability of a criminal break-in was established. Given the ambiguity of the specifications provided Henty and the discretion Henty enjoyed in constructing a room to accomplish Shell's purpose, the plaintiffs' claims of negligence should have been submitted to a jury.

For these reasons, I would reverse the verdict directing order and would remand for a new trial. There are substantial claims of error which merit reversal.

Plaintiffs contend the court erred in excluding critical portions of their expert testimony. The trial court, after an offer of proof, refused to admit the following testimony and exhibits: testimony regarding alternative construction materials and techniques available to respondent in 1977, testimony of the expert's opinion regarding the proper choice of materials and installation based on existing industry standards, expert testimony regarding the strengths of various door and door frame combinations, exhibits which simulated the construction of the door as respondent constructed it and exhibits of various alternatives and opinion testimony regarding what constituted a reasonable inspection of a completed project by an owner.

Henty claimed at trial that the above evidence was irrelevant because it was bound to simply follow the advice and specifications of Shell Oil Company in constructing the cashier's room and it argued that *Pickle v. Denny's Restaurant, Inc.*, 763 S.W.2d 678 (Mo.App.1988), controlled.

Without an item by item analysis of the proffered evidence, such evidence falls into distinct categories: first, evidence regarding alternative methods of securing the door, and second, evidence regarding reasonable inspection.

Though the admission of evidence is a matter of trial court discretion, not to be reversed unless an abuse of discretion plainly appears, *id.* at 683, expert testimony is admissible where jurors would not be expected to have knowledge of the subject of the testimony. *Randolph v. USF & G Companies,* 626 S.W.2d 418, 421 (Mo.App. 1981).

Clearly, specifications provided Henty were incomplete or at best ambiguous. Accordingly, Henty's claim at trial was that it had followed Shell Oil's specifications and instructions to the letter was contrary to the evidence and presented a fact issue for the jury.

In *Pickle,* the plaintiff was shot in the chest after getting out of his car at defendant's (Denny's Restaurant) parking lot. He was there to apply for a job at defendant's business and claimed defendant was negligent in failing to provide adequate security for the lot. The court of appeals held that because the methods of security would be within the juror's knowledge, expert testimony was unnecessary. *Id.* at 683.

In the case at bar, it cannot be said that the jurors would know the methods of constructing a cashier's enclosure or securely installing a door. Henty had a duty to exercise the care required of its profession in constructing the cashier's room. *Honey,* 708 S.W.2d at 700. Neither basis for exclusion of the evidence of alternative construction existed under the facts of our case and the evidence, critical to the issues, was thus improperly excluded.

Plaintiffs must prove that the dangerous defect was concealed from a reasonably careful inspection. *Id.* Neither relevancy nor the two stated objections of Henty constituted a valid basis for not admitting the evidence regarding reasonable inspection techniques.

The photographs of the door of the Jennings location were stipulated as constituting fair and accurate depictions of the conditions existing in 1979. Cissell, Shell's project manager who had been in charge of the construction of the Jennings station, testified he knew of no modifications made to the Jennings location after its completion in 1977. Henty objected to the admission of the pictures on the basis that 1) no foundation existed regarding the condition of the Jennings station in 1977 and 2) relevance.

While the foundation laid by plaintiffs might have been more complete, I believe the stipulation of the parties regarding the condition of the door in 1979 in combination with Cissell's admission that no changes were made to his knowledge between 1977 and 1979 established an adequate foundation for their admission. Because defendant Henty was instructed to use the Jennings location as a model for their remodeling of the Delmar location, the pictures were clearly relevant. The trial court again committed error in refusing this evidence supportive of plaintiffs' claims.

Finally, plaintiffs argue that their proffered demonstrative evidence consisting of a mock door and the attendant hardware, duplicating that which was actually used, should have been admitted. The items were relevant and corroborative of the testimony regarding the construction of the cashier's room from other witnesses. Though these demonstrative aids could arguably be characterized as cumulative, they were relevant and supportive of the plaintiffs' expert testimony.

Here again, the trial court displayed a ready tendency to exclude evidence supportive of plaintiffs' case. This exclusion resulted in error. The cumulative effect of these trial errors was manifestly prejudicial when examined against the backdrop of the order directing a defendant's verdict. The trial court in effect weighed plaintiffs' evidence and erroneously found it wanting, an error exacerbated by removing from the scales persuasive evidence important to the submissibility issues.

Because I find that the plaintiffs made a submissible case, I would reverse the judgment for directed verdict and remand the proceedings for a new trial.